Michael R. DUGAN, Appellant,

v.

ATLANTA CASUALTY COMPANIES,
Appellee.

No. S–11133.

Supreme Court of Alaska.

June 3, 2005.

Jeffrey J. Barber and Steve Sims, Law
Offices of Steve Sims, Anchorage, for Appel-
lant.

James B. Wright, Jerald L. Marcey and James B. Wright & Associates, and Rebecca Hozubin, Wilkerson & Associates, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Michael Dugan seeks coverage under his son's automobile insurance policy with Atlanta Casualty Co. We are asked to determine: (1) whether the terms of that policy extend coverage to all blood relatives of the named insured, regardless of residency; and (2) if not, whether the superior court erred in finding that Dugan, for the purposes of the insurance policy, was not a "resident" of his son's household. Because we answer both of these questions in the negative, we affirm the superior court's judgment in favor of Atlanta Casualty Co.

## II. FACTS AND PROCEEDINGS

In the early hours of September 8, 2001 Dugan was struck as a pedestrian by an uninsured motorist in front of his son Matt's apartment, resulting in severe injuries. He later attempted to collect as a "covered person" under the terms of Matt's automobile insurance policy with Atlanta Casualty Co. ("Atlanta"), which provides uninsured motorist (UM) coverage of $50,000 per person / $100,000 per accident for bodily injury. Atlanta filed a complaint seeking a declaration that Dugan is not entitled to insurance coverage. Both parties filed motions for summary judgment.

Superior Court Judge Mark Rindner denied both motions. Dugan's motion argued that the policy's terms extended coverage to literally all blood relatives, without reference to where they lived. Judge Rindner rejected this reading, requiring the claimant to reside in the policyholder's household. Atlanta's motion asked the court to rule, as a matter of law, that Dugan was not a resident of his son's household. Judge Rindner noted that examining residency is a "fact-intensive question" and that facts were in dispute regarding Dugan's status. Accordingly, he held that he "cannot rule as a matter of law whether Dugan was a 'resident' of Matthew's abode."

That question was the sole focus of a one-day bench trial, over which Superior Court Judge John Suddock presided. Judge Suddock found that Dugan was not a resident of his son's household and thus held that he was not covered by Atlanta's policy. The court dismissed Dugan's remaining counterclaims. The findings of fact, summarized below, were adopted by Dugan on appeal without qualification. Atlanta does not dispute the accuracy of the findings.

Michael Dugan, fifty years old at the time of the accident, has resided in Alaska for most of his life and at all relevant times maintained an Alaska driver's license and Alaska residency. Unable to find work in his trade in early 2001, Dugan traveled to California. He brought with him clothes and camping gear, and stored the bulk of his possessions with his son Michael in Anchorage. In the months that followed, Dugan lived in various motels and worked at three successive refinery jobs in three different southern California locations. By July or early August 2001, he quit his job and drove to Montana to meet his girlfriend, who lived in Anchorage, and to attend her parents' fiftieth anniversary celebration. Dugan sold his car in Montana, ending his need for automobile insurance, and drove to Anchorage with his girlfriend, arriving around August 26.

The superior court found that Dugan's purpose in returning to Alaska "was to visit his children and grandchildren; to look for work so that he could remain; and to explore the possibility of marriage with his girlfriend." He apparently had a standing offer of employment back in California, to which he would return if unable to find work in Alaska. The court found that "[h]is duration of stay was undetermined; he at least intended to remain here until he received two checks from his employ in California; those checks arrived around October 19, 2001."

Without an apartment of his own, Dugan's living arrangement involved three individuals. The first was his girlfriend. He stayed at her Peters Creek home the first night back in Anchorage, but not again because she worked the night shift as a nurse at the Alaska Native Service Hospital and he would have been "isolated" at her home, without a car. On nights when she was not working, the two went camping. Dugan received his PFD check at his girlfriend's address. The second individual was his son Michael, the Anchorage homeowner. While Dugan did not stay with this son, he used the house for long-term storage and for a primary mailing address, as it "provided a stable homeowner address."

The third individual was his son Matt, who shared a rented two-bedroom duplex apartment in Anchorage with a male roommate. On nights when he was not camping with his girlfriend, Dugan slept on the floor in Matt's living room, in his sleeping bag. Dugan did not have a key and did not pay any rent or utilities. He had no assigned sleeping space. His girlfriend normally picked him up after her shift ended, at 6 a.m.; after spending the day with her, he would return to Matt's apartment in the evening hours. Judge Suddock described Dugan's presence as "low impact," noting that he got along well with his son and the roommate, often left before his son's roommate awoke, and did not leave his possessions lying around.

The superior court characterized Dugan's stay as follows:

> His likely tenure at the apartment was indeterminate. There was no explicit understanding as to his exact plans; he in fact had no exact plans. He was most analogous to a young traveler, "crashing" at the home of more stably situated friends, with the nuance that the friend was his son. He would likely stay until his son or the roommate threw him out (although there was no evidence of the slightest discord); or he got tired of sleeping on the floor; or he got a job at a site provid-

ing housing; or he got a local job and could afford his own room; or he became discouraged and returned to California. Depending on the caprice of circumstance, he could have stayed another week, or a substantially longer time.

Matt testified that his father was staying at his place "off and on," but that he "was not otherwise sure what the father was doing" or how long he intended to stay. Similarly, the roommate did not convey a sense that the father had become a resident of the apartment. Matt's landlord did not know of or permit Dugan's presence. According to the superior court, if Dugan "was in town for two weeks before the accident, [he] spent about eight nights at his son's apartment, and about five nights camping."

Based on these findings, the superior court ruled that Dugan was not a "resident" of his son's household under the policy. Judgment, as well as attorney's fees totaling $11,819, was awarded to Atlanta. Dugan appeals.

## III. STANDARD OF REVIEW

■■■ We review questions of law and a trial court's application of law to fact *de novo* and adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[1] The interpretation of contract language is a question of law we review *de novo*.[2] We look to four factors when interpreting contracts: (1) the language of the disputed policy provision; (2) the language of other provisions in the policy; (3) relevant extrinsic evidence; and (4) case law interpreting similar provisions.[3]

## IV. DISCUSSION

### A. Dugan's Interpretation of the Policy Language Is Unreasonable.

The printed form of Atlanta's policy, held by Matt Dugan, includes Part C, "Uninsured/Underinsured Motorist Coverage," which obligates Atlanta to pay those damages a "covered person" is legally entitled to

1. *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003).

2. *Simmons v. Insurance Co. of N. America*, 17 P.3d 56, 59 (Alaska 2001).

3. *Id.*

but otherwise unable to recover from the owner or operator of an uninsured or under-insured motor vehicle. Under Part C, a "covered person" includes, among others, "you or any **family member**." The term "family member" is a defined term in the opening section of the policy, which reads:

> **Family member** means a person related to you by:
>
> 1. blood,
>
> 2. marriage; or
>
> 3. adoption, including a ward or foster child who is a resident of your household.

Dugan argued below, as he does here, that the phrasing and punctuation of this provision are ambiguous, leading to two possible interpretations. The first, urged by Atlanta, is that the residual clause ("who is a resident of your household") modifies the entire list, thus imposing a residency requirement on all three types of family members. The second, argued by Dugan, suggests that the residual clause modifies only the immediately preceding language ("ward and foster child") and that those related by blood or marriage need not share a residence to be covered. He argues that because ambiguous insurance policies are construed against the insurance company and in favor of coverage, he should be covered by the policy irrespective of residency. The superior court rejected these arguments and agreed with Atlanta that the residual clause unambiguously modified the entire list, requiring residency for all family members: "to read otherwise is not consistent with the other policy provisions, far-fetched, and would lead to an over-extension of the policy's intended coverage." We agree with the superior court's analysis.

■ We interpret ambiguous insurance policies in favor of the purported insured.[4] However, the mere fact that two parties to an insurance contract have differing subjec-tive interpretations of that contract does not make it ambiguous. Rather, ambiguity exists "only when the contract, taken as a whole, is *reasonably* subject to differing interpretations."[5] We determine the existence of an ambiguity "by determining the reasonable expectations of the contracting parties."[6] We discern reasonable expectations "from the language of the disputed provisions, other provisions, and relevant extrinsic evidence, with guidance from case law interpreting similar provisions."[7]

■ Dugan finds ambiguity in the grammar and layout of the provision. Specifically, he points out the puzzling use of punctuation within the list—a comma after "blood," a semi-colon after "marriage," a comma after "adoption," then nothing after "foster child." He also emphasizes the fact that the final clause has been indented, appearing to be aligned with the third item of the list. Dugan contends that such drafting implies that the residency language applies only to wards *and* foster children and thus the meaning of the provision is, at least, ambiguous.

■ We agree that the drafting is sloppy and careless. Throughout the policy, Atlanta inconsistently formats lists—*e.g.*, sometimes indenting residual language while other times placing it flush with the left margin. We can easily imagine scenarios in which such erratic punctuation and pagination make a provision ambiguous, resulting in a finding of coverage where perhaps none was intended. This provision, however, does not present such a case. The language simply cannot support Dugan's position. It is well settled that in "situations in which reasonable interpretation favors the insurer, and any other would be strained and tenuous, no compulsion exists to torture or twist the language of the contract."[8] This is such a situation.

4. *Id.* at 62.

5. *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979) (quoting *Modern Constr., Inc. v. Barce, Inc.*, 556 P.2d 528, 529 (Alaska 1976)) (emphasis added).

6. *Simmons*, 17 P.3d at 62 (citing *Zito v. Zito*, 969 P.2d 1144, 1147 n. 4 (Alaska 1998)).

7. *Id.* (quoting *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999)).

8. *Ness v. Nat'l Indem. Co. of Neb.*, 247 F.Supp. 944, 947 (D.Alaska 1965).

In viewing the policy, it is clear that the residency language is not the mere continuation of the adoption language, despite the lack of punctuation, because it has been placed squarely on the line below. If it were solely qualifying the adoption language, that portion of the residency language which could have fit on the same line as the adoption language before reaching the right margin would have occupied that space.[9]

More importantly, Dugan's reading leads to absurd results. First, it would create coverage for all blood relatives, including unknown or long-lost relatives living thousands of miles away. We have seen no evidence that any insurance company has ever offered such vast coverage.[10] Second, it would require residency for wards and foster children, but not for blood relatives. Such an arbitrary distinction cannot be the intent of the provision.[11] Dugan's reading also leads to a potential redundancy: Because shared residency is an inherent aspect of the foster parent-child relationship, it would be particularly unnecessary to include language requiring residency in those relationships. In contrast to all of these unlikely situations, Atlanta's reading produces results that seem well in line with normal industry practice.[12]

An Illinois appellate court came to the same conclusion in *Yarbert v. Industrial Fire* *and Casualty Insurance Co.*[13] In that case, a mother making a claim on her son's insurance policy argued that use of the word "relative" in the UM/UIM section was not restricted by an earlier section's definition of the word that required residency, thus allowing her to claim that the policy covered "all of his relatives, wherever found."[14] The court rejected her contention, finding this construction "patently unreasonable" and leading to "absurd consequences."[15]

Because we find that Dugan's interpretation of the policy is not a reasonable one, we reject his contention that the provision is ambiguous.[16] Accordingly, we agree with Atlanta that the policy unambiguously requires a family member to be a resident in the policyholder's household to be covered under its terms.[17]

## B. The Superior Court Did Not Err in Finding that Dugan Was Not a "Resident" of His Son's "Household."

Dugan next contends that the superior court erred by adopting and applying an improper legal test in determining whether Dugan was a resident of his son's household under the insurance policy. Dugan does not appeal the superior court's findings of fact.

**9.** After reviewing the policy, it is clear that at least the first three words of the residency clause ("who is a") would have easily fit within the margins had it been placed on the same line as the adoption language.

**10.** In many UM/UIM cases, the meaning of the terms "resident" and "household" is debated, because in those cases residency is a precondition for a relative to collect under the policy. *See, e.g.,* 9 Couch on Ins. § 123:11 (3d ed. 2004) ("Household Coverage and Exclusions, Generally—Who Are 'Relatives' or 'Members of Household' "). There appears to be no case law regarding any UM/UIM policy that did not require residency in the primary insured's household for coverage of a relative.

**11.** Even Dugan concedes that "[t]he reason for the distinction may not be clear" and that a "person who knew something about insurance might think [this distinction] unusual."

**12.** It is also worth noting that there is no evidence that the policy holder, Matt Dugan, read the policy to cover his father. When questioned on the issue, Matt responded, "I never read my policies. I don't know what they cover." Matt Dugan last renewed his automobile insurance policy on or around April 30, 2001, at a time when his father was still living in California.

**13.** 56 Ill.App.3d 1034, 14 Ill.Dec. 607, 372 N.E.2d 886 (1978).

**14.** *Id.* at 887.

**15.** *Id.*

**16.** In doing so, we also reject *a fortiori* his contention that the provision unambiguously extends coverage to all family members.

**17.** Dugan also argues that residency should not be required because the terms "resident" and "household" themselves are ambiguous. To negate residency, however, Dugan must prove that the phrasing or sentence structure is ambiguous—such that it is unclear whether or not the qualification applies—not that the terms of residency themselves are ambiguous. The requirements of the terms "resident" and "household" are addressed *infra* in Part IV.B.

The question presented is therefore one solely of law.[18]

After a one-day bench trial on residency, Judge Suddock issued an order with findings of fact, a discussion of the relevant law, and a conclusion that Dugan was not a resident. The superior court noted that we have declined to adopt a fixed legal test for determining whether a person is a "resident" of an insured's "household." Instead, the superior court determined the named insured's "reasonable expectations" as to whether coverage extends to a relative, "in light of the factual situation presented, the policy language as construed by the Court, and relevant precedent." After reviewing cases from Alaska and other jurisdictions, it concluded that "a reasonable person in the position of the son would not have expected that his automobile insurance policy provided coverage for his visiting father, who was living out of a back pack and sleeping on the floor, who had not arranged for a stay of any particular duration, and who might depart at any day." Accordingly, it awarded judgment to Atlanta.

Dugan alleges that, in doing so, the court "improperly adopted a test that required permanency or a set intended length of duration in order to find a person to be a resident of a household," and that it "gave undue weight" to such factors as the visitor having a separate bedroom, a lease agreement, and "sophisticated communication between the father and son about their plans."

We recently considered who qualifies as a resident of a household under an insurance policy. In *Simmons v. Insurance Co. of North America*[19] we explicitly declined to formulate a fixed rule, and instead required that " 'the facts of each case must be examined to determine whether the named in-

sured . . . and his relatives have ceased to be residents of the same household.' "[20] Thus, we remanded the factual issues of when residency ended to the trial court for appropriate findings.[21]

We have also construed these terms in two other cases. In *Lumbermens Mutual Casualty Co. v. Continental Casualty Co.*,[22] we held that a wife killed in an automobile accident had been a "resident of the same household" as her husband, even though the husband and wife had been separated for over two months, the wife had filed suit for divorce, and the husband had obtained the insurance policy after his wife had filed suit for divorce.[23] During the separation, the wife remained in the family home with the couple's children, while the husband stayed with relatives or at a hotel, regularly visited his wife and children at the home, paid all house, utility and grocery expenses for the family, and ultimately wished to reconcile with his wife.[24] We rejected the insurer's request to limit "resident of the same household" to those who are literally "under the same roof," but rather examined the facts of the particular case and determined that, despite the husband's temporary absence, the couple remained residents of the same household at the time of the accident.[25]

We came to a similar conclusion in *Wainscott v. Ossenkop*.[26] In *Wainscott*, the father had moved out of the family home into an apartment, continued to pay bills and insurance premiums, and believed that "reconciliation was still conceivable."[27] The wife, on the other hand, stayed in the family home with the daughter, filed for divorce and "intended her separation . . . to be permanent."[28] The issue in the case was whether the daughter, who had died in an automobile

---

18. *Rausch v. Devine,* 80 P.3d 733, 737 (Alaska 2003).

19. 17 P.3d 56 (Alaska 2001).

20. *Id.* at 64 (quoting *Wainscott v. Ossenkop,* 633 P.2d 237, 240 (Alaska 1981)). This case, of course, involves whether the relative had commenced, not ceased, residency.

21. *Id.*

22. 387 P.2d 104 (Alaska 1963).

23. *Id.* at 106–07.

24. *Id.* at 106.

25. *Id.* at 106–07.

26. 633 P.2d 237 (Alaska 1981).

27. *Id.* at 239.

28. *Id.*

accident, could qualify as a resident of her father's household.[29] We found that while the inter-spousal relationship may have been permanently severed, the separation in the parent-child relationship—which was the essential relationship in the case—may have been only temporary.[30] We noted that a "child of divorced parents may, depending on the facts, be regarded as being in the household of both."[31]

Without overruling *Lumbermens*, we adopted a rule of construction that the policy "must be construed 'so as to provide that coverage which a layman would reasonably have expected given his lay interpretation of the policy's terms.'"[32] We then deemed it reasonable for a father to expect that his insurance covered his minor children—who continued to live in a household for which he was the sole source of support—during the interim period between the initial separation and establishment of the final provisions for care and custody.[33]

In the present case, the superior court correctly applied this "reasonable expectations" test. It did not purport to alter or modify this test in any way. After making factual findings and examining how other jurisdictions have handled similar cases, the court concluded that a reasonable person in Dugan's son's position would not have expected coverage for Dugan, "who was living out of a back pack and sleeping on the floor, who had not arranged for a stay of any particular duration, and who might depart any day." Because the court correctly identified and applied the proper legal test in making its analysis, it did not err.

We also note that the court's conclusion that the son did not have "reasonable expectations" that his father was a resident of his household comports with the ordinary dictionary definition of "resident." Webster's Third New International Dictionary gives two definitions that are relevant, and both stress permanency: "dwelling or having an abode for a continued length of time"; "one who dwells in a place for a period of some duration."[34] Similarly, under "reside" this dictionary provides a synonym note distinguishing "residing" from "staying": "reside" signifies "a fixed, settled, or legal abode" and "stay" connotes a "temporary habitation" or "visits with friends and relatives."[35]

These dictionary definitions may be somewhat rigid and unhelpful as applied to certain unusual situations, such as where a couple is breaking up and the husband moves into a hotel but still claims coverage for his children.[36] But the definitions do seem to speak directly to whether Dugan crossed the line from being a visitor/guest to being a resident. With these definitions in mind, the superior court's findings of fact in this matter lead naturally to the conclusion that Dugan was merely a visitor or guest.

We also reject Dugan's arguments that the court considered improper factors and that it gave undue weight to other factors. The superior court's conclusion was amply supported by its factual findings that Dugan had no key or assigned space within the apartment, that his mail went elsewhere, that his stay was far from exclusive or lengthy, and that his stay had no intended duration. No one factor was treated as dispositive; rather, the court came to its conclusion because there was little to nothing in the record to suggest that Michael Dugan, Matt Dugan, or anyone else considered Michael to be a resident of the household. By not appealing the superior court's factual findings, Dugan accepts those findings, which include, among other things, findings that Dugan was a transient merely "crashing" at his son's for about eight nights in a two-week period. Consideration of these facts is proper under the "reasonable expectations" test.

---

**29.** *Id.*

**30.** *Id.* at 240–41.

**31.** *Id.* at 241.

**32.** *Id.* at 243–45 (quoting *Cont'l Ins. Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972)).

**33.** *Id.* at 244.

**34.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 1931 (1961).

**35.** *Id.*

**36.** *See, e.g., Wainscott*, 633 P.2d at 239.

Accordingly, we uphold the superior court's conclusion that Dugan was not a resident of his son's household under the insurance policy.[37]

## V. CONCLUSION

Because the policy did not extend coverage to blood relatives of the policy holder who were not residents of his household, and because the court's finding that Michael Dugan was not a resident of his son's household was not erroneous, we AFFIRM the superior court's judgment.

37. Dugan's briefing concludes by noting that "[w]hen ... Dugan had an intent to get a job in Alaska and resided with his son, his Alaska residency was established from that point forward. Coverage is in order." However, Dugan fails to appreciate the distinction between legal domicile and residency in a household for the purposes of an insurance contract. As the Wisconsin Supreme Court noted, "[e]very person has a domicile but not every person is a member of a household." *Pamperin v. Milwaukee Mut. Ins. Co.*, 55 Wis.2d 27, 197 N.W.2d 783, 788 (1972). A transient visitor does not become the resident of a household merely because he has no other abode. *Id.* at 787. Dugan's "residency" within the State of Alaska, or his legal domicile, is analytically and legally distinct from his "residency" within his son's household. Thus, the fact that Dugan was an Alaska resident has no bearing on whether he was a resident of his son's household.