*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KATHLEEN M. DOWNING, | ) |
| | ) Supreme Court No. S-17557 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-18-06268 CI |
| v. | ) |
| | ) O P I N I O N |
| COUNTRY LIFE INSURANCE COMPANY, | ) |
| | ) No. 7485 – October 9, 2020 |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Michael J. Schneider, Law Offices of Michael J. Schneider, P.C., Anchorage, for Appellant. Rebecca J. Hozubin, Hozubin, Moberly & Associates, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices.

CARNEY, Justice.

## I.      INTRODUCTION

A mother appeals the superior court's grant of summary judgment to the life insurance company that sold her daughter a life insurance policy. Because the superior court did not err by finding that the mother's interpretation of the insurance policy was unreasonable, we affirm the superior court's decision.

## II.  FACTS AND PROCEEDINGS

### A.  Insurance Purchase

In October 2015 Amy Downing purchased a life insurance policy from Country Life Insurance Company.  She purchased both an "executive whole life" policy that would pay a flat amount of $500,000 to her beneficiaries upon her death and a "Paid-Up Additions Rider" (PUAR) that provided an additional death benefit and an investment opportunity.

Although Amy's[1] father Tom worked for Country, another employee, Robert Sullivan, met with Amy and Tom to describe the terms of the policy.  During the meeting Sullivan provided Amy with a four-page policy "illustration."  The first page of the illustration contained a simple chart.  The chart's first row indicated that the "Base Policy," the whole life insurance policy, had a yearly premium of $4,703 and coverage of $500,000.[2]  The next row of the chart indicated that the "Paid-Up Additions Rider for 34 years remaining" had a yearly premium of $9,320 and coverage of $1,079,014.  The second page defined relevant terms in the policy.  The third and fourth pages of the illustration demonstrated the "future policy values," showing an increasing death benefit and cash value for each year premiums were paid on the PUAR.  Amy signed page four of the policy illustration.

Amy asked Sullivan why she needed one and a half million dollars in insurance coverage because it was a larger benefit than she expected to need and it required higher yearly premiums.  Sullivan explained that although she might not need the large death benefit, the structure of the PUAR provided an investment opportunity

---

[1]     Because all family members share the same surname, we refer to them by their first names for clarity.

[2]     All figures are rounded to the nearest dollar.

because it maximized the policy's cash value. Sullivan later testified that he never represented to Amy that the death benefit associated with the PUAR was a flat amount.

After paying the premiums for a year, Amy informed her parents that she intended to abandon the policy and withdraw its existing cash value. Her mother Kathleen decided to look into the policy as an investment. Tom provided a revised copy of Amy's policy illustration to Kathleen to help her decide whether to take over the policy; Kathleen focused "on the part of the document that showed how rapidly 'Total Cash Value' increased over time."

Kathleen decided to take over payment of the premiums on Amy's life insurance policy, including the PUAR, as an investment. With Tom's assistance, Amy assigned her policy to Kathleen on September 22, 2016. After Amy signed the change in ownership form, Kathleen also signed the revised policy illustration.

Four months later, on January 27, 2017, Amy died in an accident. Her death occurred in the second year of her policy coverage. Country paid the death benefit of $500,000 on Amy's whole life policy. Country also paid $108,855 on Amy's PUAR. Kathleen sued, alleging that she was entitled to $1,095,741 on Amy's PUAR, minus the $108,855 already paid.

B.     Policy Terms

A whole life insurance policy and a rider like the PUAR serve different purposes for the policyholder. A whole life insurance policy provides the policyholder's beneficiaries with a guaranteed payout to cushion the economic effects of the policyholder's death. The policyholder pays a yearly premium and, upon her death, the insurance company pays a flat amount to the policyholder's beneficiaries.

On the other hand, the PUAR is primarily intended to provide benefits to the policyholder during the policyholder's life. It is marketed to individuals with high incomes as an investment that provides tax-free growth. The policyholder is free to stop

paying the PUAR premiums and withdraw the policy's current "cash value" at any time.[3] In addition to the increasing cash value, the PUAR has a death benefit which similarly grows each year the policyholder pays the PUAR premiums.

Amy's PUAR was "attached to and made a part of the policy" and stated that "[w]here there is a conflict between this Rider and the Policy, the provisions of the Rider will control." Under the heading "AMOUNT OF PAID-UP LIFE INSURANCE," the PUAR provided:

> The amount of Paid-Up life insurance is the amount the net premium will purchase when applied at the Insured's Attained Age and sex on the date of purchase. Net premium is the rider premium paid less an expense load. The purchase price is based on the 2001 CSO[4] Age Last Birthday, sex distinct, smoker/nonsmoker, ultimate mortality table and 4.00% Interest.[5]

The PUAR calculated the "cash value" of the policy as the sum of the amount of paid-up life insurance as described above plus the value of any dividends or dividend deposits associated with the PUAR.

---

[3] Amy's policy defined "Cash Value" as: "The amount of money . . . that the Owner will receive if the Owner allows the Policy to Lapse or cancels the coverage and surrenders the Policy to the Company." The policy defined "Paid-Up" to mean "that no further premium payments are required for the insurance coverage or benefit." It also defined "Paid-Up Additions" as: "Additional life insurance on the life of the Insured purchased with dividends paid under this Policy. Paid-Up Additions increase the Policy's total death benefit and Cash Value, and require no additional premiums after being purchased."

[4] CSO stands for "Commissioners Standard Ordinary," which is the mortality table designated by the insurance commissioner.

[5] The result of this calculation is found in both the policy illustrations signed by Amy and Kathleen and the chart on "page two" of the policy.

Under the heading "TERMINATION OF THE AGREEMENT," the PUAR stated that it would terminate when any of the following events occurred: "(1) When the Policy terminates; (2) The date this Rider is surrendered for its cash value; (3) The date a Nonforfeiture Option under the Policy becomes effective; or (4) Upon written request to terminate this Rider."

The PUAR further stated that "[t]he death benefit amount for this Rider . . . is shown on the Policy Specifications" of the insurance policy. The policy's table of contents lists pages one and two as the "policy specifications." The header on the first page of the policy is "Policy Specifications." It states that the "death benefit amount" is $500,000.[6] It also documents that Amy was a 31-year-old female non-smoker. The first page of the policy displays a chart, reproduced in relevant part below:

| | Benefit | Amount | Annual Premium | Years Payable |
|---|---|---|---|---|
| ICC13 (WL) | Basic Policy | | $4,570 | 64 |
| DWP260 (AKAZ13) | Disability Waiver of Premium | | $130 | 29 |
| ICC13 (PUAR) | Paid-Up Additions Rider | $1,095,741 | $9,320 | 34 |

Sullivan testified that the first page illustrated "a level premium paid-up additions rider that was . . . applicable for 34 years, which would have been through age 65 . . . simply to coincide with most people's perception of [a] retirement age" of 65.

The first page is followed by an intentionally blank page. The next two pages contain a continuous chart on pages numbered "PAGE 2" and "PAGE 2

---

[6] Amy's policy defines "Death Benefit Amount" as: "The amount used to calculate the Proceeds that are payable upon the death of the Insured. The Death Benefit Amount does not include adjustments for . . . paid-up additions . . . or other additional benefits or riders."

CONTINUED."[7]   The chart is entitled "TABLE OF GUARANTEED POLICY VALUES FOR ENTIRE CONTRACT."  The chart is arranged by policy year:  each row displays a successive year of paid policy premiums, Amy's projected age, the guaranteed cash value of the policy, and the guaranteed amount of paid-up insurance.  Select rows from the chart follow:

| End of Policy Year | Attained Age | Tabular Cash or Loan Value | Paid-Up Insurance |
|---|---|---|---|
| 1 | 32 | $8,788 | $52,864 |
| 2 | 33 | $17,895 | $103,879 |
| 5 | 36 | $54,566 | $284,838 |
| 10 | 41 | $130,383 | $571,206 |
| 34 | 65 | $699,351 | $1,434,126 |
| 50 | 81 | $1,085,732 | $1,511,509 |
| 90 | 121 | $1,579,014 | $1,579,014 |

Thus, if Amy continued to pay yearly premiums, by the second policy year, she would have a guaranteed cash value of $17,895 as well as $103,879 in paid-up insurance.  The bottom of each page also lists a "death benefit amount" of $500,000 — the coverage from the whole life policy.

### C.   Proceedings

In April 2018, Kathleen filed a complaint alleging that she was entitled to $1,095,741 from the PUAR instead of the $108,855 paid by Country.  Kathleen asserted that page one of Amy's policy clearly stated that she was entitled to a death benefit of $1,095,741 from the PUAR.  Country filed an answer and counterclaim, responding that

---

[7]   The pages are numbered in this way due to a regulation requiring this chart to be on "page two" of the policy.

the policy's table of guaranteed values showed that the guaranteed paid-up insurance in the second policy year was "no less than $103,879" and that both Amy and Kathleen had signed illustrations "showing similar guaranteed values." Country asserted that it had "paid out all benefits that were due to Kathleen Downing."

Kathleen moved for summary judgment; Country opposed and cross-moved for summary judgment. The superior court heard oral argument and ruled from the bench at the close of the hearing.

The court granted summary judgment to Country. It found that "there is only one reasonable interpretation" of the policy and rejected Kathleen's argument that the policy's terms were defined exclusively on the first page. The court found that there was "never a representation . . . in any of these documents that there [was] only going to be one page" of the contract. It acknowledged that if it limited its review to the first page of the policy, it would rule in Kathleen's favor. But it looked at the policy's table of contents, which indicated that there were multiple pages of policy specifications.

The court rejected Kathleen's argument that policy language explaining the calculation of paid-up life insurance was unintelligible, instead finding that if an

> objective, reasonable person . . . takes the time . . . that might be necessary for them to understand it . . . that this is the formula that is dependent primarily on two things: time and the amount of premiums paid. It is pretty clear in here that the amount of premiums paid is an important part of how you're going to calculate this number, which means that, as it progresses over time, it is going to increase in value. It is not a flat rate. There's something that is going to happen over time in terms of that value increasing.

The court agreed that a person "may not be able to understand the precise math when you add in the age and the gender and the smoking and all those other little factors in terms of the matrix." But the court found that it was clear that the "benefit [was] going to

continue up to a certain age, and so it's an investment" and that the policyholder would pay premiums of approximately $9,000 until retirement age, at which point the death benefit would be approximately $1,500,000. And the court noted the parties' agreement that Sullivan and Amy had "a dialogue" about this growing benefit and that Amy had an opportunity to have all of her questions answered.

The court concluded that while the contract "takes a little bit of time" to fully understand, there was ultimately only one way to interpret it. It found the PUAR's definition of the "Amount of Paid-Up Life Insurance" set forth the calculation of the death benefit, which was based on time and premiums paid, and resulted in an increasing value over time as yearly premiums were paid. And it found that the PUAR directed the policyholder to the policy specification, which contained a chart on page two that illustrated how the amount of paid-up life insurance increased each year.

The court then granted Country's cross-motion for summary judgment. It later issued a written final judgment denying Kathleen's motion for summary judgment and granting Country's cross-motion for summary judgment, "establishing that [Country] owes nothing further under its life insurance policy."

Kathleen appeals.

## III. STANDARD OF REVIEW

"We review grants of summary judgment de novo."[8] "Summary judgment is proper if there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law."[9] "We also review de novo as a question of law the

---

[8]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[9]     *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 757 (Alaska 2008). Kathleen concedes that this case "presents questions of pure law."

interpretation of insurance policy language."[10]  "In addressing the proper interpretation of an insurance policy, we look to '(1) the language of the disputed provisions in the policy, (2) other provisions in the policy, (3) extrinsic evidence, and (4) case law interpreting similar provisions.' "[11]

## IV.  DISCUSSION

Because "we treat insurance policies as contracts of adhesion," we construe such policies "so as to provide that coverage which a layperson would have reasonably expected from a lay interpretation of the policy terms."[12]  Under this doctrine of reasonable expectations, the policyholder's "objectively reasonable expectations" govern, even if "painstaking study of the policy provisions would have negated those expectations."[13]  "We interpret ambiguous insurance policies in favor of the purported insured."[14]  But it is also well-established that "the mere fact that two parties to an insurance contract have differing subjective interpretations of that contract does not make

---

[10]  *State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008).

[11]  *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 657-58 (Alaska 2011) (quoting *Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004)).

[12]  *U.S. Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979); *see also Teel*, 100 P.3d at 4 ("We construe grants of [insurance] coverage broadly and interpret exclusions narrowly.").

[13]  *Teel*, 100 P.3d at 4 (quoting *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1222 (Alaska 2000)); *accord Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1160, 1170-71 (Alaska 2018).

[14]  *Dugan v. Atlanta Cas. Cos.*, 113 P.3d 652, 655 (Alaska 2005).

it ambiguous."[15]  "Rather, ambiguity exists 'only when the contract, taken as a whole, is *reasonably* subject to differing interpretations.' "[16]

Kathleen argues, primarily based upon her position that the first page alone defines the contract's terms, that Amy had a reasonable expectation that the PUAR had a flat death benefit of $1,095,741.  She argues that the first page was "of pivotal importance" to Amy's, and then her own, reasonable understanding of the benefit amount.  She makes a number of subsidiary arguments about the reasonableness of her expectations.[17]

Kathleen acknowledges that the PUAR states that the death benefit amount of the PUAR can be found in the "Policy Specifications."  She points to the first page of the policy, entitled "Policy Specifications," which contains a chart that appears to show $1,095,741 as the PUAR benefit amount.  Kathleen then argues that because the next page of the policy is intentionally left blank, it is intended to "signal[] to the insured that he or she need look no further for information."  Kathleen urges us to "stop right here in [the] analysis" because the first page of the policy "flatly, singularly, and unqualifiedly declares its death-benefit 'AMOUNT' to be $1,095,741."

---

[15]    *Id.*

[16]    *Id.* (emphasis in original) (quoting *Colver*, 600 P.2d at 3); *see also State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008) ("[A]mbiguities only exist when there are two or more reasonable interpretations of particular policy language.").

[17]    Kathleen additionally asserts that there is an ambiguity between the terms on the first page of the policy (showing a benefit of $1,095,741) and the terms on the second page of the policy (showing a variable benefit) that should be resolved in her favor, and that the variable death benefit associated with the PUAR "contains unfairly surprising or unusual terms [that] must be disclosed with sufficient clarity and conspicuosity."

We agree with Kathleen that the first page of the policy is misleading. But, like the superior court, we decline her invitation to ignore other pages of the policy, the policy illustrations that both she and Amy signed, and Sullivan's explanation of the policy terms to Amy.[18]

Terms of an insurance contract must be interpreted as a whole, not simply by the policy's first page.[19] The PUAR directs the policyholder to the "policy specifications." The policy's table of contents indicates that the specifications are found on pages one and two of the policy, even though only the first page includes the words "policy specifications." The chart on page two is not "buried" in the document, as Kathleen suggests, but is on the very next page. And although the formula that generates the amount of paid-up insurance is complex, the chart on page two provides a clear demonstration of the formula's projected annual results in a format understandable by a layperson. It shows the guaranteed cash value and the guaranteed amount of paid-up insurance for each year the PUAR premiums are paid.

A version of this chart was also provided to Amy as an "illustration" and a visual guide when Sullivan explained the PUAR to her before she purchased the policy. Amy signed a policy illustration when she bought the policy. And Kathleen signed a similar illustration provided by Tom when she took over the policy. The chart in the policy and the illustrations that both Amy and Kathleen signed make clear that the cash

---

[18] *Cf. Dugan*, 113 P.3d at 655 (recognizing that even when contract "drafting is sloppy and careless," if "reasonable interpretation favors the insurer, and any other would be strained and tenuous, no compulsion exists to torture or twist the language of the contract" (quoting *Ness v. Nat'l Indem. Co. of Neb.*, 247 F. Supp. 944, 947 (D. Alaska 1965))).

[19] *See id.*; *see also Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1171, 1170-71 (Alaska 2018) (recognizing that courts cannot "consider a single [contract] term in isolation").

value and amount of paid-up insurance provided by the terms of the PUAR change over time.[20] Kathleen herself conceded that the rapid increase in "Total Cash Value" displayed in the policy illustration was a major reason she took over Amy's policy.

The PUAR makes clear that, unlike the whole life policy to which it was attached, the policyholder may stop paying PUAR premiums and withdraw the current cash value at any time. The PUAR states that it can be terminated if it is "surrendered for its cash value." Kathleen admitted that Amy was aware of this: she stated that before she took over payment of the premiums "Amy intended to withdraw the policy's cash value and abandon the policy." This feature of the PUAR simply would not make sense if it operated like a whole life policy and conferred a flat death benefit.[21] Instead, as the PUAR makes clear and both Kathleen and Amy seemed to understand, payment of a yearly premium increased the value of the policy, and the policyholder could, at any point, terminate the policy and withdraw its current cash value. Because the PUAR is clear that, unlike whole life insurance, it has a value that increases over time, it would be unreasonable for a policyholder to believe that the PUAR conferred a flat death benefit of over one million dollars in its second year.[22]

---

[20] We agree with Kathleen that the illustrations do not "control" the terms of the PUAR, but we disagree that the illustrations "do little to clarify" the policyholder's reasonable expectations of the policy terms. The illustrations provide valuable evidence about whether a layperson could reasonably believe that the PUAR had a flat death benefit.

[21] Kathleen's argument that the definition of "paid-up" supports her reasonable expectation that she would receive a death benefit of over one million dollars once again depends upon her position — which we have rejected — that the first page of the policy is the only relevant page. The policy's definition on its page four does not support her argument. *See supra* note 3.

[22] Kathleen makes several arguments that the PUAR was sold as "whole life
(continued...)

In addition to the PUAR itself and the chart, Kathleen admitted that Sullivan described the policy to Amy and Amy had an opportunity to ask questions. Sullivan testified that he never represented the PUAR as having a flat benefit and that he explained to Amy that the PUAR maximizes the cash value of the policy over time.

Even though the policy is a contract of adhesion, after taking into account the terms of the PUAR, the table of guaranteed values in the policy, the illustrations provided to Amy and Kathleen, and Sullivan's conversation with Amy, a policyholder could not have an objectively reasonable expectation that the PUAR would pay a flat death benefit of $1,095,741 in the second year of the policy.

## V.    CONCLUSION

We therefore AFFIRM the superior court's summary judgment order.

---

**22**    (...continued)
insurance" and should have operated as a whole life policy does, with a flat death benefit amount. But the PUAR was not sold as a whole life policy: it was sold as a *rider* on a whole life policy. The policies are structured differently to provide different benefits to the policyholder, and it is thus not reasonable to assume that the PUAR would have the same structure as a whole life policy.