**Craig DYDELL, Appellant,**

**v.**

**Dr. Bernard TAYLOR, Respondent.**

**No. SC 90912.**

Supreme Court of Missouri,
En Banc.

Feb. 8, 2011.

George P. Coughlin, Matthew W. Geary, Dysart Taylor Lay Cotter & McMonigle PC, Kansas City, for Dydell.

Derek T. Teeter, Allan V. Hallquist, Hayley E. Hanson, Husch Blakcwell Sanders LLP, Kansas City, for Taylor.

Alisa B. Klein, Tony West, Mark B. Stern, Department of Justice of Justice, Charles P. Rose, Stephen H. Fried, Mari Colvin, General Counsels, Department of Education, Washington, D.C., Jerry L. Short, Assistant U.S. Attorney, Kansas City, MO, for the United States Government, which filed a brief as a friend of the Court.

Kelli Hopkins, Columbia, for the Missouri School Boards' Association and Na-

tional School Boards Association, which filed a brief as friends of the Court.

LAURA DENVIR STITH, Judge.

Craig Dydell appeals from the entry of summary judgment in favor of former Kansas City school district superintendent Bernard Taylor in Mr. Dydell's action for damages stemming from Superintendent Taylor's alleged negligence in permitting a student to assault Mr. Dydell. Mr. Dydell argues that the circuit court erred in holding that Superintendent Taylor was immune from suit by operation of the Paul D. Coverdell Teacher Protection Act of 2001, *20 U.S.C. §§ 6731–6738 (2006)* (Coverdell Act) because the Act is not a permissible exercise of Congress' constitutional authority under the spending or commerce clauses of the United States Constitution.

This Court finds that the Coverdell Act is a constitutional exercise of Congress' spending power under article I of the United States Constitution and that the trial court did not err in finding it applies to Superintendent Taylor. Accordingly, the judgment in favor of Superintendent Taylor is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 2001, the Kansas City school board appointed Bernard Taylor superintendent of the Kansas City school district. As superintendent, he was the chief administrative officer and head of all divisions and departments of the school district. Superintendent Taylor was responsible for executing and implementing the school board's policies, rules and regulations. Those duties included making internal operational decisions regarding the school district.

In January 2004, James Whitehead was expelled from Westport charter school in Kansas City for attempting to bring a knife onto school grounds.[1] On January 12, 2004, as a result of the incident at Westport, juvenile authorities arranged for Mr. Whitehead's admission to a psychiatric hospital. Doctors discharged Mr. Whitehead from the psychiatric hospital on January 26, 2004.

In February 2004, Mr. Whitehead's mother sought to enroll him in the Kansas City school district. On June 17, 2004, the school district cleared him for enrollment. While evaluating whether Mr. Whitehead should be cleared, the school district became aware that he had been arrested for the incident at Westport. In connection with his clearance, the school district received Mr. Whitehead's psychiatric records from the psychiatric hospital. Because he had a learning disability at the time he was enrolled, Mr. Whitehead was referred to the school district's special education department to determine what school he should attend. The special education department prepared an individualized education program ("IEP") for Mr. Whitehead. The IEP did not refer to his previous attempt to bring a knife into Westport. Eventually the district placed Mr. Whitehead at Central High School, which he began attending in the fall semester of 2004.

Craig Dydell began attending Central a year later, in the fall semester of 2005. One day, while Mr. Dydell was seated in the cafeteria at Central, Mr. Whitehead attacked him from behind with a box-cutter knife and sliced Mr. Dydell's neck open. The attack was unprovoked, as Mr.

---

1. At all times pertinent to this case, Westport charter school was not part of the Kansas City school district.

Dydell never had met Mr. Whitehead. Mr. Dydell survived the attack.

Mr. Dydell filed a negligence action against Superintendent Taylor, alleging that the latter's failure to supervise Mr. Whitehead adequately or to inform school district staff of Mr. Whitehead's psychiatric and criminal history caused Mr. Dydell's injuries. Shortly before trial was to have begun, Superintendent Taylor was granted leave to amend his answer to raise a defense of immunity based on the Coverdell Act. Following briefing and argument, the trial court granted Superintendent Taylor's motion for summary judgment based on the Act. In so doing, it rejected Mr. Dydell's arguments that the Act was beyond Congress' authority to enact and that it did not apply to Superintendent Taylor because his actions in regard to Mr. Whitehead were not carried out in compliance with local laws as required by the Coverdell Act. Mr. Dydell appeals. As his appeal challenges the validity of a statute of the United States, this Court has exclusive appellate jurisdiction. *Mo. Const. art. V, § 3.*

## II. STANDARD OF REVIEW AND PRINCIPLES GOVERNING REVIEW OF THE CONSTITUTIONALITY OF STATUTES

■ This Court's review on an appeal from summary judgment "is essentially *de novo.*" *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper only if the moving party establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Rule 74.04(c)(6).* This Court will review the record in the light most favorable to the party against whom judgment

was entered and accords the non-movant the benefit of all reasonable inferences from the record. *ITT Commercial Fin. Corp.,* 854 S.W.2d at 376.

■ " 'Constitutional challenges to the validity of any alleged right or defense asserted by a party to an action must be raised at the earliest opportunity consistent with good pleading and orderly procedure.' " *State ex rel. Houska v. Dickhaner,* 323 S.W.3d 29, 33 (Mo. banc 2010), *quoting, Litzinger v. Pulitzer Pub. Co.,* 356 S.W.2d 81, 88 (Mo. banc 1962). "A statute is presumed to be constitutional and will not be invalidated unless it clearly and undoubtedly violates some constitutional provision and palpably affronts fundamental law embodied in the constitution." *State v. Richard,* 298 S.W.3d 529, 531 (Mo. banc 2009). When evaluating the constitutional validity of a statute, "[t]his Court will 'resolve all doubt in favor of the act's validity' and 'may make every reasonable intendment to sustain the constitutionality of the statute.' " *Reproductive Health Servs. of Planned Parenthood v. Nixon,* 185 S.W.3d 685, 688 (Mo. banc 2006), *quoting Westin Crown Plaza Hotel v. King,* 664 S.W.2d 2, 5 (Mo. banc 1984).

## III. THE COVERDELL ACT PROVIDES IMMUNITY TO SUPERINTENDENT TAYLOR

### A. The Coverdell Act is a Permissible Exercise of Congress' Spending Power

■ Mr. Dydell argues that Congress had no authority to enact the Coverdell Act because it attempts to coerce states into recognizing immunity of certain teachers, which he contends is beyond the enumerated powers of Congress and, therefore, is a nullity.[2]

---

2. Because, for the reasons set out below, this Court finds that the Coverdell Act is within

Congress' power under the Spending Clause, it does not reach Mr. Dydell's argument that

■ Congress is a legislative body of discrete enumerated powers.[3] *See U.S. Const. art. I, § 1* (entrusting Congress only with the "legislative Powers herein granted"). Congress' limited authority to enact laws reflects our country's deep solicitude for federalism and is calculated to lessen the potential for tyranny and abuse. *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[T]he principal benefit of the federalist system is a check on abuses of government power").

■ Among Congress' enumerated powers is the power to spend. *U.S. Const art I., § 8, cl. 1* ("Congress shall have Power . . . to pay the debts and provide for the common defence and general welfare of the Unites States"). Incident to its spending power, and integral to resolution of this case, Congress is authorized to "fix the terms on which it shall disburse federal money to the States." *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). "Legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* Such a "quid pro quo" is constitutionally permissible so long as it is not unduly coercive and certain other standards are met. As discussed below, the parties disagree as to whether the Coverdell Act is improperly coercive as applied to Missouri and as to whether the other standards for its constitutional application are met because it requires Missouri to recognize federally imposed immunity for school officials in return for the receipt of federal school funds. Resolution of this issue requires review of the provisions of the Act.

Congress enacted the Coverdell Act—the full title of which is the Paul D. Coverdell Teacher Protection Act of 2001, *20 U.S.C. §§ 6731–6738 (2006)*—as part of the No Child Left Behind Act of 2001. *20 U.S.C. §§ 6301–7941 (2006).* The Coverdell Act specifically states that it "shall only apply to States that receive funds under this chapter, and shall apply to such a State as a condition of receiving such funds." *20 U.S.C. § 6734.* The "chapter" the Act references is chapter 70 of title 20 of the United States Code, also known as the Elementary and Secondary Education Act. The Coverdell Act also provides, "This subpart preempts the laws of any State to the extent that such laws are inconsistent with this subpart, except that this subpart shall not preempt any State law that provides additional protection from liability relating to teachers." *Id. § 6735(a).* Moreover, a state may elect not to be governed by the teacher protection provisions:

> This subpart shall not apply to any civil action in a State court against a teacher with respect to claims arising within that State if such State enacts a statute in accordance with State requirements for enacting legislation—
>
> (1) citing the authority of this subsection;
>
> (2) declaring the election of such State that this subpart shall not apply, as of a

---

the Act is not otherwise authorized under the Commerce Clause.

3.  In this way, Congress' authority differs from that of the states' legislatures. Those legislatures possess plenary authority to pass laws and, therefore, may enact statutes pursuant to broad police powers rather than pursuant to

specifically enumerated powers (subject, of course, to any specifically enumerated freestanding constitutional limitation, for instance *Mo. Const. art. III § 40* (barring the enactment of local or special laws) and *Mo. Const. art. I § 13* (barring the enactment of laws that are retrospective in operation)).

date certain, to such civil action in the State; and

(3) containing no other provisions.

*Id. § 6735(b).*

It is undisputed that Missouri has not enacted legislation rejecting the Coverdell Act and that Missouri is a recipient of some of the funding provided via the Elementary and Secondary Education Act. The Missouri Department of Elementary and Secondary Education promulgated regulations and standards for the receipt and distribution of these federal funds, including federal funds received under titles I, II and IV of the federal Elementary and Secondary Education Act. *5 C.S.R. 50–321.010.* All such funds are received by the state pursuant to chapter 70 of title 20 of the United States Code. Among other types of federal funding, the state and the Kansas City school district receive federal funds under title I of the Elementary and Secondary Education Act.[4]

It also is undisputed that in 1963, the Missouri legislature elected to receive all funds appropriated by the federal government for public schools as of that date and through "any other subsequent acts of congress which provide federal funds for public schools." *§ 178.430.1, RSMo 1969.* The legislature deemed that the "benefits of all funds appropriated under the provisions of such acts are accepted as provided in the acts." *§ 178.430.2, RSMo 1969.*

The Coverdell Act, therefore, applies in Missouri if the state accepts federal education funds under chapter 70, unless its application violates the constitution because, as Mr. Dydell alleges, it was beyond congressional authority to enact due to the nature of the teacher immunity provisions it requires Missouri courts to recognize.

■ In particular, Mr. Dydell argues that the Act improperly attempts to control state courts by providing that (if certain other requirements are met) "no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school." *20 U.S.C. § 6736.* Under the Act, "teacher" is defined to include "a teacher, instructor, principal, or administrator." *Id. § 6733(6).* As an administrator, Superintendent Taylor is a "teacher" and is covered by the act's immunity provision.

The Coverdell Act's requirement that Missouri provide such immunity to teachers in return for federal education funds is hardly novel. It is an example of Congress' traditional use of its spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal quotation marks and citation omitted).

The United States Supreme Court has held on many occasions that it is constitutional for Congress to so use the spending power. *Dole,* the seminal case in this area, explains the Supreme Court's reasoning. South Dakota challenged the validity of a federal law imposing a condition that a portion of federal highway funds would be withheld from any state government that failed to impose a 21–year–old drinking age. 483 U.S. at 205, 107 S.Ct. 2793. *Dole* recognized that "objectives not thought to be within Article I's 'enumerated legislative fields' ... may nevertheless be attained through the use of the spending power and the conditional grant of

---

4. For example, in 2005 and 2006, the state received approximately $380 million in federal title I funds. Both the Kansas City school district and the state received federal title I funds in the 2007–2008 and 2008–2009 school years.

federal funds." *Id.* at 207, 107 S.Ct. 2793. After reviewing its precedents establishing general spending power requirements, the Supreme Court held that the law was a permissible exercise of Congress' spending power. *Id.* at 212, 107 S.Ct. 2793.

Mr. Dydell acknowledges the Supreme Court's holding in *Dole* and implicitly concedes that Congress could require a state, as a condition of receiving federal education funds, to enact legislation that provides exactly the same immunity as does the Coverdell Act. Mr. Dydell argues, however, that *Dole* is inapposite here because in this case, instead of requiring that states that want certain federal monies must enact legislation agreeing to the terms under which it will be provided, the Coverdell Act inverts the process. It requires a state that chooses to accept chapter 70 education funds to enact a statute that *rejects* the Coverdell Act's immunity provisions, rather than requiring it to enact a statute stating that it accepts them. Mr. Dydell contends that this distinction is what makes Coverdell an unconstitutional exercise of the otherwise broad spending power of Congress. Mr. Dydell fails to adequately explain why this distinction should require a different result, however.

■ *Dole* does set out certain requirements that must be met for Congress' imposition of conditions on receipt of funds to come within its spending clause powers. *Id.* at 207, 107 S.Ct. 2793. Requiring a state to affirmatively adopt as opposed to affirmatively reject the federal legislation is not one of those requirements, however.

■ Instead, *Dole* instructs only that the spending power is subject to the following general restrictions: (1) the spending clause legislation must be in "pursuit of the general welfare;" (2) Congress must state the conditions on the receipt of federal funds clearly and unambiguously; (3) conditions "might be illegitimate" if they are unrelated to the purpose of the grant program; and (4) "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Id.* at 207–08, 107 S.Ct. 2793.

Here, the four spending power requirements are satisfied. With respect to the first requirement, in "considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Id.* at 207, 107 S.Ct. 2793. The Act's stated purpose is "to provide teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment." *20 U.S.C. § 6732.* Given the deference accorded Congress, this is sufficient to show that the Coverdell Act was enacted in pursuit of the general welfare.[5]

The second requirement is met. As noted, the Coverdell Act plainly states that it "shall only apply to States that receive funds under this chapter, and shall apply to such a State as a condition of receiving such funds." *Id. § 6734.* This language is ample to place a state on notice that accepting funds under the Elementary and Secondary Education Act binds it to the operation of the immunity provision.

■ The third requirement is that the condition imposed must bear some relation

---

5. This parallels the purpose of Missouri's common law doctrine of official immunity. See *Davis v. Lambert–St. Louis Int'l Airport,* 193 S.W.3d 760, 765 (Mo. banc 2006) ("The function of official immunity is to protect individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties"). This Court does not reach the issue whether Missouri's official immunity doctrine would apply here.

to the purpose of the grant program. In conducting this analysis, a court need not define "the outer bounds of the 'germaneness' or 'relatedness' limitation on the imposition of conditions under the spending power." *Dole*, 483 U.S. at 209 n. 3, 107 S.Ct. 2793. The germaneness of the Coverdell Act's immunity provision to Congress' purpose in making grants for elementary and secondary education is evident. Chapter 70 of title 20 of the United States Code is titled "Strengthening and Improvement of Elementary and Secondary Schools." Again, Congress has determined that establishing Coverdell immunity will provide "teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment." *20 U.S.C. § 6732.* This purpose is rationally related to Congress' stated goal of strengthening and improving elementary and secondary education.

The fourth spending power requirement also is met. No independent constitutional provision bars providing immunity for school administrators in undertaking the functions of their job. Indeed, "statutes limiting liability are relatively commonplace and have consistently been enforced by the courts." *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

Mr. Dydell nonetheless argues that the Coverdell Act violates the Tenth Amendment to the United States Constitution, which states, "The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." He argues that the imposition of federal immunity law interferes with the Missouri courts' sovereignty because the grant of immunity traditionally is a state matter on which the federal government should not intrude. This claim is baseless.

Most basically, the Supreme Court has concluded that when a federal law is "supported by affirmative grants of power to Congress" such as the spending power, the law "is not inconsistent with the Tenth Amendment." *New York v. United States*, 505 U.S. 144, 173, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). That analysis is directly applicable here.

Equally importantly, Mr. Dydell's Tenth Amendment argument fails to take into account that by accepting federal funds and choosing not to pass a law rejecting the Coverdell Act, Missouri has chosen to allow the Coverdell Act's immunity provisions to become part of Missouri law. This Court applies that law—when properly invoked and applicable to the case—as it does other validly enacted Missouri statutes governing immunities. *See, e.g., § 632.440, RSMo 2000* (no liability for healthcare professionals in detaining, transporting or releasing civil detainees); *§ 192.740, RSMo 2000* (no liability for divulging confidential information for individuals or organizations providing information to the department of health and senior services in accordance with the statutes requiring the establishment of a head and spinal cord information registry).

Although not specifically set out as a requirement, *Dole* also states that a condition imposed incident to the spending power may be impermissible if "the financial inducement offered by Congress [is] so coercive as to pass the point at which 'pressure turns into compulsion.' " *Dole*, 483 U.S. at 211, 107 S.Ct. 2793, *quoting Steward Machine Co. v. Davis*, 301 U.S. 548, 590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). As is evident from the provisions of the Coverdell Act set out above, however, the Act is devoid of any coercion whatsoever. While it provides that it applies to

states that receive education funds and preempts contrary state laws that might reduce teacher protections, it also provides that it will not preempt state law or even apply to actions against teachers in any state that enacts a statute specifically rejecting it, stating:

This Subpart shall not apply to any civil action in a State court against a teacher with respect to claims arising within that State if such a State enacts a statute in accordance with State requirements for enacting legislation—

(1) citing the authority of this subsection;

(2) declaring the election of such State that this subpart shall not apply, as of a date certain, to such civil action in the State; and

(3) containing no other provisions.

*20 U.S.C. § 6735(b).*

■ As such, the Act specifically provides that Missouri can nullify the application of the Act to it merely by enacting legislation that says as much and that it can do so without any loss of federal funds. This means that even were Missouri to reject the Act, there would be no loss of funding or other consequence—whether to make the provisions of the Coverdell Act apply in Missouri is completely up to Missouri. There is no stick at all, only carrots. There is no coercion. While, as noted earlier, Mr. Dydell says that it is unconstitutional to require Missouri to enact legislation to reject the Act rather than to consider the Act rejected unless specifically adopted, he cites no authority supporting this argument. Moreover, in adopting section 178.430.1 in 1963, Missouri specifically and affirmatively did agree to accept all funds appropriated by the federal government for public schools as of that date and through "any other subsequent acts of congress which provide federal funds for public schools."

*§ 178.430.1, RSMo 1969.* This statute still is in effect. The Coverdell Act is a permissible exercise of Congress' spending power.

### B. The Requirements for the Coverdell Act's Application are Satisfied

■ Next, Mr. Dydell argues that summary judgment in favor of Superintendent Taylor was not proper because he failed to satisfy a necessary requirement for the Act to apply. Mr. Dydell claims that the superintendent failed to comply with *20 U.S.C. § 6736(a)(2).* It requires that, for the Coverdell Act to apply, "the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school."

■ Mr. Dydell maintains that Superintendent Taylor's conduct did not conform with two aspects of an internal Kansas City school district written policy titled "Policy JGF, Discipline Reporting and Records." Mr. Dydell cites no authority that a local school board discipline directive falls within the meaning of the term "local law" as used in the Coverdell Act. Policy JGF has no force of law, and its violation does not constitute a crime or infraction. Even were it considered a local law, however, the record does not show a failure by Superintendent Taylor to act in conformity with the policy.

Mr. Dydell contends first that the superintendent failed to comply with a sentence of Policy JGF that directs that "any portion of a student's Individualized Education Program (IEP) that is related to demonstrated or potentially violent behavior shall be provided to any teacher and other district employees with a need to know the information." He says that this

required Superintendent Taylor to ensure that information concerning Mr. Whitehead's "demonstrated or potentially violent behavior" was contained in the IEP, and the failure to include it violated school policy.

Mr. Dydell misreads Policy JGF. As just quoted, it does not impose a duty on a superintendent to ensure that an IEP include information about "demonstrated or potentially violent behavior." Indeed, as a superintendent has no role in preparing an IEP, such a requirement would be illogical.[6] Rather, Policy JGF states that *if the IEP contains information* about "demonstrated or potentially violent behavior," then that portion of the IEP "shall be provided" to those with a need to know. As Mr. Dydell explicitly acknowledges, Mr. Whitehead's IEP contained no mention of "demonstrated or potentially violent behavior." Therefore, Policy JGF imposed no duty on the superintendent to relay a nonexistent portion of the IEP to others.

Mr. Dydell also argues that Superintendent Taylor violated a second provision of Policy JGF: "Teachers and other school district employees who have a need to know will also be informed by the superintendent or designee of any act committed by a student in the district that is reported to the district by [law enforcement personnel] in accordance with state law." Mr. Dydell argues that this provision required Superintendent Taylor personally to disclose Mr. Whitehead's criminal conduct to those with a need to know and that he failed to do so.

As Mr. Whitehead was not a student of the district at the time he brought a knife to Westport, it does not appear that this provision has any application here. Even

were it applicable, however, the policy expressly states that notice be given "by the superintendent *or designee.*" As such, given the size of the Kansas City School District, Policy JGF, not surprisingly, allows a designee to fulfill any reporting duty rather than requiring the superintendent to do so personally. The only record evidence about this issue is Superintendent Taylor's statement at his deposition that these matters were delegated to the Student Hearing Office and that a variety of departments handled reporting. There was no evidence that he personally took on responsibility to ensure that specific information about specific students was transmitted to particular people and that he failed to fulfill any such obligation. No breach of this aspect of Policy JGF has been shown.

## IV. CONCLUSION

For all of these reasons, the judgment of the trial court is affirmed.

All concur.

6. Under the federal Individuals with Disabilities Education Act, *20 U.S.C. § 1400–1482,* IEPs are created by an "IEP Team," which is composed of the special education student's parents, at least one regular education teacher, at least one special education teacher and a representative of the local school district qualified to provide special education services. *20 U.S.C. § 1414(d)(1)(B).*