**AMERICAN NATIONAL PROPERTY & CASUALTY CO., Respondent,**

v.

**Randall WYATT, Appellant,**

**Robin Ferguson, Appellant.**

No. WD 75226.

Missouri Court of Appeals,
Western District.

March 26, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2013.

Application for Transfer Denied June 25, 2013.

Nicki Cannezarro, for Respondent.

Andrew Protzman, for Appellants.

Before Division One: THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS, Judge and GARY D. WITT, Judge.

JOSEPH M. ELLIS, Judge.

On August 16, 2010, Joyce Bentley drove her granddaughter, Megan Wyatt, and Megan's friend, Robin Ferguson, to her apartment at 103 N.E. Dogwood Street in Oak Grove, Missouri, for an overnight visit. Bentley parked her car in the garage, shut the garage door, and went inside, neglecting to turn off the car engine. Later that day, responding to a call from a neighbor about a suspicious odor, police entered the house and found Bentley and Ferguson unconscious and Wyatt dead from carbon monoxide inhalation. Bentley later died at the hospital.

Megan's father subsequently filed a wrongful death claim against Bentley and American National Property & Casualty Company ("ANPAC"), with whom Bentley had a "Missouri Tenants Homeowners Pol-

icy" at the time of the incident. Similarly, Robin, by and through her biological father and next friend, filed a negligence claim against Bentley and ANPAC. The plaintiffs from these two tort actions will hereinafter be referred to as "the Plaintiffs."

In response to those two lawsuits, ANPAC filed the current declaratory judgment action in the Circuit Court of Jackson County seeking a declaration that its policy excluded coverage for the claims asserted by the Plaintiffs against Bentley. The parties subsequently filed competing motions for summary judgment based upon an agreed set of stipulated facts. Ultimately, the trial court denied the Plaintiffs' motion and granted ANPAC's, concluding that the pollution exclusion in the policy precluded coverage because carbon monoxide from a vehicle is a "pollutant" under the unambiguous terms of the policy.[1] The court found that "[a]n average layperson knows that automobile exhaust fumes have a toxic, potentially fatal effect, especially when inhaled by a person in a confined space and therefore would understand that automobile fumes which contain carbon monoxide are 'pollutants.'" The Plaintiffs appeal from that decision.

Because the trial court makes its decision to grant summary judgment based upon the record submitted and the law, this court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. *Harpagon MO, LLC v. Clay Cnty. Collector*, 335 S.W.3d 99, 102 (Mo.App. W.D. 2011). In so doing, we apply the same criteria as the trial court in determining whether summary judgment was properly entered. *Id.* "Summary judgment is proper only if the moving party establishes that

there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Dydell v. Taylor*, 332 S.W.3d 848, 852 (Mo. banc 2011). Accordingly, in reviewing the propriety of summary judgment, this Court views the record "in the light most favorable to the party against whom judgment was entered and accords the non-movant the benefit of all reasonable inferences from the record." *Id.*

▇▇▇ In the case at bar, the parties stipulated to the material facts. The injuries suffered by the two children were undisputedly caused by carbon monoxide generated by a car that was negligently left running in the garage by Bentley. Thus, the only issue to be adjudicated is whether, as a matter of law, ANPAC established that coverage was excluded under the language of the insurance contract. "The interpretation of an insurance policy, and the determination whether coverage and exclusion provisions are ambiguous, are questions of law that this Court reviews *de novo*." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010).

▇▇▇ The Plaintiffs argue that the trial court erred in finding that the injuries were excluded from coverage because the exclusionary language related to pollutants was ambiguous and should have been construed against ANPAC. They claim that a reasonable homeowner purchasing the policy would not interpret the policy as excluding from coverage damages caused by exposure to carbon monoxide within the home and would instead believe the exclusion to be applicable only to cases of traditional environmental pollution.

▇▇▇ "When interpreting the terms of an insurance policy, this Court applies the

---

1. The trial court concluded that the motor vehicle exclusion for injuries arising out of the use of a motor vehicle did not bar cover-

age and denied ANPAC's claim for summary judgment on that basis. ANPAC has not challenged that conclusion on appeal.

meaning that would be understood by an ordinary person of average understanding purchasing this insurance." *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 705–06 (Mo. banc 2011). "If the policy is ambiguous, it will be construed against the insurer." *Id.* at 706. "If the policy is unambiguous, the policy will be enforced according to its terms." *Id.*

▮▮▮ "A policy is ambiguous if there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Id.* (internal quotation omitted). "The language of an insurance policy is ambiguous when it is reasonably and fairly open to different constructions. To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy." *Vega v. Shelter Mut. Ins. Co.*, 162 S.W.3d 144, 147 (Mo.App. W.D.2005) (internal quotation omitted). Whether an ambiguity exists must be assessed by an examination of the exclusionary clause in the context of the entire policy. *Jensen v. Allstate Ins. Co.*, 349 S.W.3d 369, 377 (Mo. App. W.D.2011).

The personal liability provisions of the ANPAC policy appear to provide broad coverage for the insured:

> We will pay, up to our **limit of liability,** all sums for which an insured is legally liable because of **bodily injury** or **property damage** caused by an occurrence covered by this policy. We will defend any suit, even if the suit is groundless, false, or fraudulent, provided the suit resulted from **bodily injury** or **property damage** not excluded under this coverage.

(bold omitted). The exclusionary language relied upon by ANPAC in denying coverage states:

> **Coverage E—Personal Liability and Coverage F—Medical Payments to Others do not apply to bodily injury or property damage:**
>
> \* \* \*
>
> n. arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants ...

Elsewhere, the policy defines "pollutants" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including but not limited to smoke, vapors, soot, fumes, acids, alkalis, toxic chemical, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed." "Combining these various provisions, the Policy excludes coverage for any bodily injury resulting from the 'discharge, dispersal, seepage, migration, release or escape' of 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, [toxic] chemicals and waste.'" *Apana v. TIG Ins. Co.*, 574 F.3d 679, 681 (9th Cir.2009).

This is standard language used by the insurance industry and is frequently referred to as the "total pollution exclusion." *Id.* at 680. While barely touched upon in Missouri case law, "[t]he scope of this exclusion has been described as one of the most hotly litigated insurance coverage questions to arise over the past three decades." *Id.* (internal quotation omitted). "Indeed, 'rarely has any issue spawned as many court decisions, and as variant in rationales and results, as has the pollution-exclusion clause.'" *Id.* (quoting *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 800 (Ala.2002)).

The historical background of the total pollution exclusion was aptly set out by the Illinois Supreme Court in *American States Insurance Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 79–82 (1997):

The events leading up to the insurance industry's adoption of the pollution exclusion are "well-documented and relatively uncontroverted." *Morton International, Inc. v. General Accident Insurance Co.,* 134 N.J. 1, 31, 629 A.2d 831, 848 (1993). Prior to 1966, the standard-form CGL policy provided coverage for bodily injury or property damage caused by an "accident." *Center for Creative Studies v. Aetna Life & Casualty Co.,* 871 F.Supp. 941, 943 n. 3 (E.D.Mich.1994), quoting J. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994). The term "accident," however, was not defined in the policy. As a result, courts throughout the country were called upon to define the term, which they often interpreted in a way as to encompass pollution-related injuries. In response, the insurance industry revised the CGL policy in 1966 and changed the former "accident"-based policy to an "occurrence"-based policy. The new policy specifically defined an "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury and property damage that was neither expected nor intended from the standpoint of the insured." *Morton International. Inc.,* 134 N.J. at 32, 629 A.2d at 849 (and cases cited therein). Despite these changes, courts continued to construe the policy to cover damages resulting from long-term, gradual exposure to environmental pollution. As one court observed, "so long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants." *New Castle County v. Hartford Accident & Indemnity Co.,* 933 F.2d 1162, 1196–97 (3d Cir.1991).

Meanwhile, at about the same time, the United States Congress substantially amended the Clean Air Act in an effort to protect and enhance the quality of the nation's air resources. Pub.L. No. 91–604, 84 Stat. 1676 (1970) (now codified at 42 U.S.C. §§ 7401 through 7642 (1983), as amended). The passage of these amendments, which included provisions for cleaning up the environment, imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies. *Westchester Fire Insurance Co. v. City of Pittsburg,* 768 F.Supp. 1463, 1469 n. 8 (D.Kan.1991), aff'd 987 F.2d 1516 (10th Cir.1993). The insurer's burdens further increased with the relatively recent, and now well-publicized, environmental disasters of Times Beach, Love Canal and Torrey Canyon. See *Center for Creative Studies,* 871 F.Supp. at 944; see also *Morton International Inc.,* 134 N.J. at 33–34, 629 A.2d at 850.

In the wake of these events, the insurance industry became increasingly concerned that the 1966 occurrence-based policies were "tailor-made" to cover most pollution-related injuries. *Morton International Inc.,* 134 N.J. at 33, 629 A.2d at 850, quoting Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo. L.J. 1237, 1251 (1986). To that end, changes were suggested, and the industry proceeded to draft what was to eventually become the pollution exclusion. The Supreme Court of New Jersey explained, "foreseeing an impending increase in claims for environmentally-related losses, and cognizant of the broadened coverage for pollution damage provided by the occurrence-based, CGL policy, the insurance industry drafting organizations began in 1970 the process of drafting and securing regulatory approval for the standard

pollution-exclusion clause." *Morton International, Inc.,* 134 N.J. at 32, 629 A.2d at 849–50. Consequently, the General Liability Governing Committee of the Insurance Rating Board instructed its drafting committee "to consider the question and determine the propriety of an exclusion, having in mind that pollutant-caused injuries were envisioned to some extent in the adoption of the current [policies]." *Morton International, Inc.,* 134 N.J. at 34, 629 A.2d at 850, quoting T. Reiter, D. Strasser & W. Pohlman, *The Pollution Exclusion Under Ohio Law: Staying the Course,* 59 U. Cin. L.Rev. 1165, 1197 (1991).

The result of these efforts was the addition of an endorsement to the standard-form CGL policy in 1970. The endorsement provided in pertinent part:

> "[This policy shall not apply to bodily injury or property damage] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Three years later, in 1973, the insurance industry incorporated the above endorsement directly into the body of the policy as exclusion "f."

During the next 13 years, various courts labored over the exact meaning of the words "sudden and accidental." Much of the litigation focused on whether the word "sudden" was intended to be given a strictly temporal meaning such that, in order for the exception to apply, the discharge of pollution had to have been "abrupt." See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992). This controversy generated an enormous amount of litigation, leading one commentator to describe the dispute as one of "the most hotly litigated insurance coverage questions of the late 1980's." J. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994), quoted in *Center for Creative Studies,* 871 F.Supp. at 943. Not surprisingly, insurance companies responded by drafting a new version of the exclusion, which, first appearing in 1985, is now commonly known as the "absolute pollution exclusion." ... The two most notable features of this latest version are (i) the lack of any exception for the "sudden and accidental" release of pollution, and (ii) the elimination of the requirement that the pollution be discharged "into or upon land, the atmosphere or any watercourse or body of water." See *Weaver v. Royal Insurance Co. of America,* 140 N.H. 780, 674 A.2d 975 (1996). Significantly, the purpose of the current exclusion, like its predecessor, is "to exclude governmental clean up costs from [the scope of] coverage." *West American Insurance Co. v. Tufco Flooring East. Inc.,* 104 N.C.App. 312, 324, 409 S.E.2d 692, 699 (1991).

In short, "the history of the pollution-exclusion clause in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages." *Nav–Its, Inc. v. Selective Ins. Co. of Am.,* 183 N.J. 110, 869 A.2d 929, 936–37 (2005).

Since the adoption of the absolute pollution exclusion, however, insurers have repeatedly sought to exclude coverage under this exclusion for injuries that have occurred outside the realm of what would be considered traditional environmental pollu-

tion. The assorted federal and state courts addressing the scope of this clause "are split on the issue of whether an insurance policy's total pollution exclusion bars coverage for all injuries caused by contaminants, or whether the exclusion applies only to injuries caused by traditional environmental pollution." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir.1999). "It is clear that a nationwide split of opinion exists regarding: (1) whether 'absolute pollution exclusions' bar coverage for incidents outside of traditional environmental pollution (e.g., contamination of groundwater over a long period of time), and (2) whether 'absolute pollution exclusions' are unambiguous." *NGM Ins. Co. v. Carolina's Power Wash & Painting, LLC*, Civ. No. 2:08–CV–3378–DC, 2010 WL 146482, at *3–4, 2010 U.S. Dist. LEXIS 2362, at *11–12 (D.S.C. Jan. 12, 2010). "One commentator determined that 'about half of the cases nationwide to consider [the first issue]—and 17 of 23 state supreme courts [2]—have found that 'absolute' and 'total' pollution exclusions do not bar coverage for claims outside of the context of traditional industrial pollution." *Id.* at *4, 2010 U.S. Dist. LEXIS 2362, at *12 (quoting John M. Ellison, *Recent Developments in the Law Regarding the "Absolute" and "Total" Pollution Exclusions, the "Sudden and Accidental" Pollution Exclusion and Treatment of the "Occur-*

*rence" Definition, SN050 ALI–ABA 1* (2008)).

Missouri case law in this area is sparse. ANPAC argues that *Cincinnati Insurance Co. v. German St. Vincent Orphan Association, Inc.*, 54 S.W.3d 661, 663 (Mo.App. E.D.2001), dictates that we affirm the trial court. In *Cincinnati Insurance*, a building was closed down and its owner forced to incur clean-up expenses after a floor stripper was used to pulverize and scrape up old vinyl flooring, creating thick clouds of dust containing asbestos. *Id.* The insurer of the building owner denied coverage based upon the pollution exclusion. *Id.* at 665. The Eastern District of this Court concluded that "friable asbestos unquestionably falls into the category of a solid or thermal 'irritant' or 'contaminant' as those words appear in the policy's paragraph . . . defining 'pollutant,' and is therefore a pollutant as the term would be understood by a reasonable person in the position of the insured." *Id.* at 666. It further concluded that clouds of dust containing friable asbestos generated inside a building through the use of a floor stripper were clearly "released or discharged" as contemplated by the policy and rejected the insured's argument that the exclusion was meant only to apply to traditional environmental pollution because the word "environment" was not contained in the exclusion. *Id.*

---

**2.** *See e.g. Am. States Ins. Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 79–82 (1997); *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205, 1216 (2003); *State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 850 (Ind. 2012); *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 757 N.E.2d 329, 334 (2001); *W. Alliance Ins. Co. v. Gill*, 426 Mass. 115, 686 N.E.2d 997, 1000 (1997); *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 763 N.Y.S.2d 790, 795 N.E.2d 15, 20 (2003); *Kent Farms, Inc. v. Zurich Ins. Co.*, 140 Wash.2d 396, 998 P.2d 292, 295 (2000); *Porterfield v.*

*Audubon Indem. Co.*, 856 So.2d 789, 805–07 (Ala.2002); *Minerva Enters. Inc. v. Bituminous Cas. Corp.*, 312 Ark. 128, 851 S.W.2d 403, 404–06 (1993); *Weaver v. Royal Ins. Co. of Am.*, 140 N.H. 780, 674 A.2d 975, 977–78 (1996); *Nav–Its, Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110, 869 A.2d 929, 932–39 (2005); *Gainsco Ins. Co. v. Amoco Prod. Co.*, 53 P.3d 1051, 1062–66 (Wyo.2002); *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 13 P.3d 785, 791 (2000); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 135 (La.2000); *Donaldson v. Urban Land Interests, Inc.*, 211 Wis.2d 224, 564 N.W.2d 728 (1997).

On the other hand, the Plaintiffs contend that judgment should have been entered in their favor under *Hocker Oil Co. v. Barker–Phillips–Jackson, Inc.,* 997 S.W.2d 510 (Mo.App. S.D.1999). In *Hocker Oil,* the Southern District of this Court concluded that the pollution exclusion was ambiguous as to whether it would cover property damage caused by leakage of gasoline from a storage tank at a gas station. The Court noted that gasoline was not identified as a pollutant in the definition of "pollutant" and that the insured, a company operating a gasoline station, could have reasonably concluded that gasoline was not deemed a pollutant for purpose of the exclusion since it was not specifically identified as such. *Id.* at 518. The court further stated that "it would be an oddity for an insurance company to sell a liability policy to a gas station that would specifically exclude that insured's major source of liability." *Id.* The Plaintiffs argue that, like leaking gasoline, carbon monoxide was not identified as a pollutant in the definition of "pollutant" and that a purchaser of renter's insurance could reasonably conclude that carbon monoxide within the residence was not deemed to be a pollutant as it was not specifically identified as such.

We find neither of these Missouri cases particularly persuasive in determining whether injuries caused by carbon monoxide originating within the residence were unambiguously excluded under the pollution exclusion in Bentley's "tenants homeowners policy." Moreover, to large extent, we find ourselves in disagreement with the Eastern District's cursory analysis of the pollution exclusion clause in *Cincinnati Insurance.*

As noted *supra,* the personal liability provision of the ANPAC policy would appear on its face to provide broad liability coverage for the insured. Furthermore, simply reading the exclusionary language and applying an ordinary meaning of the term "pollutant" would not allow the conclusion that the language unambiguously excludes things not considered traditional pollution, like accidental carbon monoxide poisoning within a building. It is through the definition of "pollutant" as "any irritant or contaminant" that ANPAC, and other insurers, have sought to exponentially expand the bounds of this exception beyond what an ordinary person would deem a pollutant. The terms "irritant" and "contaminant" are not defined in the policy language, and ANPAC attempts to apply a general dictionary definition of those terms and asserts that they should be read to exclude any injury caused by anything that can irritate or contaminate.

ANPAC's reading of the policy language "is predicated on a basic fallacy, one shared by many of the courts on which it relies: the conclusion that the meaning of policy language is to be discovered by citing one of the dictionary meanings of the key words, such as 'irritant' or 'discharge.'" *MacKinnon v. Truck Ins. Exch.,* 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205, 1214 (2003). "Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context." *Id.* at 1213. "Rather, a court properly refusing to make 'a fortress out of the dictionary' must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *Id.* at 1214 (quoting *Russian Hill Improvement Assn. v. Bd. of Permit Appeals,* 66 Cal.2d 34, 56 Cal.Rptr. 672, 423 P.2d 824 (1967) (quoting Justice Learned Hand's dictum in *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945))).

"The terms 'irritant' and 'contaminant,' when viewed in isolation, are virtually

boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property." *Donaldson v. Urban Land Interests, Inc.,* 211 Wis.2d 224, 564 N.W.2d 728, 732 (1997) (internal quotation omitted). "In other words, practically every substance would qualify as a 'pollutant' under this definition, rendering the exclusion meaningless." *State Auto. Mut. Ins. Co. v. Flexdar, Inc.,* 964 N.E.2d 845, 850 (Ind.2012). "Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results." *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir. 1992).

"A reasonable policy holder would not understand the policy to exclude coverage for *anything* that irritates [or contaminates]." *Reg'l Bank of Col. v. St. Paul Fire & Marine Ins. Co.,* 35 F.3d 494, 498 (10th Cir.1994) (emphasis in original). These terms are "not to be read literally and in isolation, but must be construed in the context of how it is used in the policy, i.e., defining "pollutant." *Id.; see Jensen,* 349 S.W.3d at 377 (noting that whether an ambiguity exists must be assessed by an examination of the exclusionary clause in the context of the entire policy); *Golden Rule Ins. Co. v. R.S.,* 368 S.W.3d 327, 334 (Mo.App. W.D.2012) ("The plain meaning of the various terms in an insurance policy is not determined by viewing the terms in isolation but in viewing them in reference to the whole policy."). In short, an interpretation that ignores the familiar connotations of the word "pollutant" and that would lead to absurd results is not the interpretation that an ordinary person of average understanding would adopt. *MacKinnon,* 73 P.3d at 1214. "It seems far more reasonable that a policyholder would understand the exclusion as being limited to irritants and contaminants commonly thought of as pollution and not as applying to every possible irritant or contaminant imaginable." *Reg'l Bank of Col.,* 35 F.3d at 498. The language of the insurance policy being reasonably open to different constructions, the language is ambiguous and must be construed applying the interpretation most favorable to the insured.

 Having rejected ANPAC's overly broad interpretation, we must still consider whether a reasonable insured could believe that residential carbon monoxide poisoning is not an injury caused by a pollutant. "A substance may or may not be a pollutant under the terms of a policy exclusion depending on the context or environment in which the substance is involved." *Langone v. Am. Family Mut. Ins. Co.,* 300 Wis.2d 742, 731 N.W.2d 334, 340 (App.2007).

ANPAC incorrectly asserts that carbon monoxide is always and invariably an irritant or contaminant and should, therefore, always be considered a pollutant. "[M]ost people are aware of the dangers of high levels of or extended exposure to carbon monoxide; however, people are exposed to low levels of carbon monoxide every day." *Id.* "Like carbon dioxide, carbon monoxide is colorless, odorless, and present in the air around us." *Id.* at 338. "Carbon monoxide, like carbon dioxide, becomes harmful when levels are abnormally high or exposure is unusually extended." *Id.* at 340. "[B]ecause carbon monoxide, like carbon dioxide, does not have the harmful effect of an irritant or contaminant unless or until it accumulates to certain levels, it is contextually ambiguous." *Id.* at 337.

In considering whether the pollution exclusion precluded coverage for injuries caused by inhalation of carbon monoxide emitted from a faulty wall heater in an apartment, the Tenth Circuit noted that

"[w]hile a reasonable person of ordinary intelligence might well understand carbon monoxide is a pollutant when it is emitted in an industrial or environmental setting, an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution.'" *Reg'l Bank of Col.*, 35 F.3d at 498. Numerous other cases have likewise concluded that carbon monoxide accumulating in a building as a result of a defective or negligently operated machine or due to inadequate ventilation is not unambiguously excluded as a pollutant under the exclusion. *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.*, 47 F.3d 34, 39 (2d Cir.1995) (applying New York law); *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 757 N.E.2d 329 (2001); *W. Alliance Ins. Co. v. Gill*, 426 Mass. 115, 686 N.E.2d 997 (1997); *Koloms*, 227 Ill.Dec. 149, 687 N.E.2d at 81; *Langone*, 731 N.W.2d at 340; *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 682 (Ky.App.1996); *Kenyon v. Sec. Ins. Co. of Hartford*, 163 Misc.2d 991, 626 N.Y.S.2d 347, 351 (1993); *Thompson v. Temple*, 580 So.2d 1133, 1135 (La.Ct.App. 1991).[3] Similarly, we conclude that an insured could reasonably read the pollution exclusion in a manner that would not exclude coverage for injuries caused by accidental accumulation of carbon monoxide within a building or residence from a source originating therein.

This conclusion is bolstered by the drafters' use of terms "discharge," "dispersal," "seepage," "migration," "release," and "escape," which are terms regularly applied to describe events of general environmental pollution. *MacKinnon*, 73 P.3d at 1215–16. "It may be an overstatement to declare that 'discharge, dispersal, release or escape,' by themselves, are environmental law terms of art. But, ... these terms, used *in conjunction with* 'pollutant,' commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted." *Id.* at 1216. In this context, an insured could reasonably believe that accidentally leaving a car running in a closed garage, thereby allowing carbon monoxide to accumulate in the garage and house, would not constitute "discharge, dispersal, seepage, migration, release or escape" of the carbon monoxide and that the exclusion would only apply to acts of environmental pollution. Such a conclusion is also consistent with the historical reasons for the adoption of the pollution exclusion noted *supra*.

 Furthermore, the existence of ambiguity in the policy language and the fact that the policy was a contract of adhesion makes applicable the doctrine of reasonable expectations. *Kellar v. Am. Family Mut. Ins. Co.*, 987 S.W.2d 452, 455 (Mo.App. W.D.1999). "The reasonable expectations doctrine provides that the expectations of adherents and beneficiaries to insurance contracts will be honored if their expectations of coverage are reasonable in light of the wording of the policy, even if a more thorough study of the policy provisions would have negated these expectations." *Id.* Carbon monoxide poisoning is one of the more significant and well-known risks of injury related to home-

**3.** *But see Reed v. Auto–Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90, 92 (2008) (holding pollution exclusion unambiguously excludes coverage for carbon monoxide poisoning caused by the failure to keep a rental house in good repair); *Bituminous Cas. Corp. v. Sand Livestock Sys. Inc.*, 728 N.W.2d 216, 222 (Iowa 2007) ("The plain language of the ex-

clusion encompasses the injury at issue because carbon monoxide is a gaseous irritant or contaminant, which was released from the propane power washer."); *Bernhardt v. Hartford Fire Ins. Co.*, 102 Md.App. 45, 648 A.2d 1047, 1051 (1994); *Nautilus Ins. Co. v. Country Oaks Apartments Ltd.*, 566 F.3d 452, 458 (5th Cir.2009) (applying Texas law).

ownership in this country—to the extent that federal, state, and local governments recommend the installation and maintenance of carbon monoxide detectors in every home.[4] Absent clear and unambiguous exclusion of liability for such injuries, a reasonable person purchasing a homeowners or tenants insurance policy would certainly expect coverage for this risk to be included in such a policy. The ANPAC policy language is simply not sufficiently clear to negate that reasonable expectation.[5]

For the foregoing reasons, the judgment is reversed, and summary judgment is entered in favor of the Plaintiffs. *Rule 84.14.*

All concur.

---

4. Indeed, some jurisdictions mandate carbon monoxide detectors. *See e.g., Cal. Health & Safety Code §§ 17926 & 17926.1* (requiring carbon monoxide detectors in all dwellings with a fossil fuel burning heater or appliance, fireplace, or attached garage); *Colo.Rev.Stat. § 38–45–101 to –104* (requiring carbon monoxide detectors in all dwellings sold or transferred that have a fossil fuel burning heater or appliance, fireplace or attached garage; also required to obtain a building permit for alterations, repairs or additions); *430 Ill. Comp. Stat. § 135/10* (requiring carbon monoxide alarms in every dwelling unit within 15 feet of any room used for sleeping purposes); *Mass. Gen. Laws Ann. ch. 148, § 26f1/2* (requiring that every dwelling, building or structure occupied in whole or in part for residential purposes to have a working carbon monoxide alarm if the building contains fossil-fuel burning equipment or incorporates enclosed parking); *Minn.Stat. § 299F.51* (requiring every single family dwelling and every dwelling unit in a multifamily dwelling have an operational carbon monoxide alarm within ten feet of every room used for sleeping purposes); *Or.*

*Rev.Stat. § 105.838* (requiring functioning carbon monoxide alarms for the sale or transfer of any one-, two- or multi-family housing that contains a carbon monoxide source) & *Or.Rev.Stat. § 455.360* (requiring carbon monoxide alarms in all new residential structures and for the issuance of a building permit for rebuilding, alteration, or repair of a residential structure); *Wis. Stat. Ann. § 101.647* (requiring the owner of any residential dwelling with fuel-burning appliances, a fireplace, or attached garage to install a functional carbon monoxide detector in the basement and each floor of the dwelling except the attic, garage, or storage area).

5. *See Andersen v. Highland House Co.,* 93 Ohio St.3d 547, 757 N.E.2d 329, 332 (2001) ("[T]he policy in question never clearly excludes claims for deaths or injuries caused by residential carbon monoxide poisoning. It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on nonspecific and generic words or phrases that could be construed in a variety of ways.").