*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THE ESTATE OF JOSIAH WHEELER, pursuant to the assignment of rights of Deborah Overly and Terry Summers, and Keith Wheeler and Rhetta Wheeler, individually and as representatives of the Estate of Josiah Wheeler, | ) ) ) ) ) ) ) ) | Supreme Court No. S-18849 <br><br> 9th Cir. Case No. 22-35484 <br><br> U.S. District Court No. 4:20-cv-00041-SLG |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 7752 – February 28, 2025 |
| GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY, a subsidiary of USAA Insurance Company, | ) ) ) ) ) ) | |
| Appellee. | ) ) | |

Certified Question from the United States Court of Appeals for the Ninth Circuit on Appeal from the United States District Court for the District of Alaska, Sharon Gleason, District Judge.

Appearances: Kenneth L. Covell, Fairbanks, for Appellant. Cheryl L. Graves, Farley & Graves, P.C., Anchorage, for Appellee. Laura A. Foggan, Crowell & Moring, LLP, Washington, D.C., and Eva R. Gardner, Ashburn & Mason, P.C., Anchorage, for Amicus Curiae Complex Insurance Claims Litigation Association.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

BORGHESAN, Justice.

## I.    INTRODUCTION

In this matter we answer a question certified to us by the United States Court of Appeals for the Ninth Circuit. The question is whether a coverage exclusion in a homeowners insurance policy for loss caused by "pollutants" bars coverage for injury caused by exposure to carbon monoxide emitted from a home appliance that was improperly installed. To answer this question, we consider the insurance policy as a whole and interpret its terms according to an insured's reasonable expectations. The wording of the policy's pollution exclusion is broad, as is the definition of "pollutants." But several aspects of the exclusion suggest a narrower interpretation. And the policy specifically excludes coverage for exposure to lead paint and asbestos — potentially toxic substances that fall within the policy's definition of "pollutants" but which, like carbon monoxide, are often found within the home and pose little danger absent defect or malfunction. Yet there is no comparable exclusion for carbon monoxide. With these features of the policy in mind, we conclude that an insured could reasonably expect coverage for injuries resulting from exposure to carbon monoxide from an improperly installed home appliance.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

The parties do not dispute the underlying facts of this case. Seventeen-year-old Josiah Wheeler rented a cabin in Tok owned by Deborah Overly and Terry Summers. During the tenancy Wheeler was found dead in the cabin's bathtub. An autopsy revealed that he had died of acute carbon monoxide poisoning. A deputy fire marshal investigated the property and discovered that a propane water heater, installed in the same room as the bathtub, had an exhaust flue unconnected to any external

venting. Testing showed that when the water heater ran with the bathroom door shut, the room would accumulate high levels of carbon monoxide.

At the time of Wheeler's death, the cabin was covered under a homeowners insurance policy issued by Garrison Property and Casualty Insurance Company (Garrison). The policy included coverage for personal liability and medical payments for others, but this coverage was subject to certain exclusions. The policy excluded coverage for, among other things, bodily injury or property damage:

> k. Arising out of the actual, alleged, or threatened discharge, dispersal, release, escape, seepage or migration of **"pollutants"** however caused and whenever occurring. This includes any loss, cost or expense arising out of any:
>
> > (1) Request, demand or order that any **"insured"** or others test for, monitor, clean up, remove, contain, treat, detoxify, or assess the effect of **"pollutants"**; or
> >
> > (2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **"pollutants"**.
>
> l. Arising out of exposure to lead paint or other lead-based products.
>
> m. Arising out of exposure to asbestos.

The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."

## B.  Proceedings

Wheeler's estate and each of his parents individually sought an out-of-court settlement with the homeowners, Overly and Summers. Overly and Summers notified Garrison of the claims, and Garrison responded with a letter denying coverage. Garrison's letter took the position that carbon monoxide is a "pollutant" under the policy and that the losses from Wheeler's death were not insured due to the pollution exclusion. Garrison declined to defend Overly and Summers against Wheeler's claims.

Overly and Summers eventually signed a confession of judgment admitting that they negligently caused Wheeler's death. They confessed liability for $1,400,000 to Wheeler's estate and $140,000 to each of Wheeler's parents. Overly and Summers also assigned their right to proceed against Garrison for losses arising from Wheeler's death.

In December 2020 Wheeler's estate and each of his parents (collectively the Estate) filed suit against Garrison in federal district court. The complaint maintained that the policy's pollution exclusion did not apply to Wheeler's death. The Estate sought an award of damages and a declaratory ruling that the homeowners policy provided coverage. Eventually the parties filed competing motions for declaratory relief, which the district court construed as motions for summary judgment.

The district court entered summary judgment against the Estate. The court first concluded that the language in the exclusion was unambiguous. The district court ruled that our decision in *Whittier Properties, Inc. v. Alaska National Insurance Co.*[1] suggested we would interpret the pollution exclusion "literally" and would conclude that it was unambiguous. The district court concluded that Overly and Summers could not have reasonably expected coverage. It reasoned that carbon monoxide fell within the policy's definition of "pollutant." It also read the terms of the exclusion — "discharge, dispersal, release, escape, seepage or migration of 'pollutants' however caused and whenever occurring" — to encompass emissions from a water heater. It therefore concluded that Wheeler's death was not covered.

The Estate appealed, renewing many of its arguments from the district court proceedings. The Ninth Circuit Court of Appeals expressed doubt that *Whittier Properties* conclusively established that we would interpret the pollution exclusion literally. It also cited decisions from many jurisdictions that have enforced the exclusion with respect to one substance but limited it with respect to others.

---

[1] 185 P.3d 84 (Alaska 2008).

Instead of ruling on the merits, the Ninth Circuit sought clarification from our court on how the pollution exclusion should be interpreted under Alaska law. Specifically, the court certified the following question: "Does a total pollution exclusion in a homeowners insurance policy exclude coverage of claims arising from carbon monoxide exposure?" The court also indicated: "We do not intend the form of this question to limit the Alaska Supreme Court's consideration of the issues relevant to this matter. If the Alaska Supreme Court decides to consider the certified question, it may reword the question in its discretion."

We accepted the certified question and ordered full briefing.[2]

## III.  STANDARD OF REVIEW

The proper interpretation of insurance policy language is a question of law.[3] We use our "independent judgment when answering a certified question of law and 'select the rule of law that is most persuasive in light of precedent, reason, and policy.' "[4]

## IV.  DISCUSSION

### A.  Under Alaska Law Insurance Contracts Are Interpreted To Give Effect To The Reasonable Expectations Of The Insured.

The exclusion applied by Garrison to deny coverage is common in homeowners insurance policies and is often referred to as the "total pollution exclusion."[5] This exclusion was developed in the early 1970s as an effort by the insurance industry to limit coverage for pollution-related losses in commercial general

---

[2]  We thank amicus curiae Complex Insurance Claims Litigation Association for its participation in this appeal.

[3]  *Downing v. Country Life Ins. Co.*, 473 P.3d 699, 704 (Alaska 2020).

[4]  *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 598 (Alaska 2021) (quoting *Kallstrom v. United States*, 43 P.3d 162, 165 (Alaska 2002)).

[5]  9 JORDAN R. PLITT ET AL., COUCH ON INSURANCE § 127:13 (2024 ed.).

liability policies.[6]  It is a standard provision that has been modified several times over the years to limit liability related to pollution.[7]

Courts around the country have interpreted the pollution exclusion in a variety of factual settings, including for losses caused by carbon monoxide or other gases.[8]  These decisions are not unanimous — they often reach different conclusions, and even decisions reaching similar results use different reasoning.[9]

The parties' briefing cites extensively to decisions from other jurisdictions.  These decisions are illuminating, but we focus primarily on the text of the specific insurance policy at issue in this case and the reasonable expectations of the insured.

---

[6]     *See Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 79-81 (Ill. 1997); *Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.*, 629 A.2d 831, 848-50 (N.J. 1993); E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 GEO. L.J. 1237, 1251-52 (1986); Robert M. Tyler, Jr. & Todd J. Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy*, 17 IDAHO L. REV. 497, 499-500 (1981).

[7]     *See* JORDAN R. PLITT ET AL., *supra* note 5; *Koloms*, 687 N.E.2d at 81.

[8]     Chad G. Marzen, *The Pollution Exclusion and Carbon Monoxide*, 93 N.D. L. REV. 219, 222-37 (2018).

[9]     *Compare Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636-37 (Minn. 2013) (holding carbon monoxide is "pollutant" within plain language of pollution exclusion), *with Koloms*, 687 N.E.2d at 79 (finding pollution exclusion overbroad and narrowly construing exclusion according to its historical application in industrial context), *and Stoney Run Co. v. Prudential-LMI Com. Ins. Co.*, 47 F.3d 34, 36-39 (2d Cir. 1995) (finding pollution exclusion ambiguous as to carbon monoxide in residence and construing exclusion in light of historical use to exclude coverage in industrial context), *and Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994) (concluding "an ordinary policyholder would not reasonably characterize carbon monoxide emitted from a residential heater which malfunctioned as 'pollution' ").

In Alaska "[t]he liability of an insurer is generally determined by the terms of the policy it has issued."[10] "Where an insurance company by plain language limits the coverage of its policy, we recognize that restriction."[11] "But because an insurance policy is a contract of adhesion, we construe it to give effect to the insured's reasonable expectations."[12] "In other words, '[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' "[13]

Because the specific factual context in which the policy applies is important to its interpretation, we exercise our discretion to slightly rephrase the question certified to us by the Ninth Circuit. We ask: Does the pollution exclusion in Overly and Summers's homeowners insurance policy bar coverage for injury arising out of exposure to carbon monoxide emitted by an improperly installed home appliance?

**B.      Our Decision In *Whittier Properties* Does Not Control This Case.**

Although we have never before interpreted a pollution exclusion as applied to carbon monoxide poisoning, we have interpreted a similarly worded pollution exclusion in a commercial insurance policy. In *Whittier Properties* we held that the pollution exclusion unambiguously barred coverage for losses due to gasoline leaking from a gas station into the surrounding soil and water.[14]

---

[10]      *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1222 (Alaska 2000); *see also Thompson v. United Servs. Auto. Ass'n*, 542 P.3d 222, 226 (Alaska 2024).

[11]      *C.P. ex rel. M.L.*, 996 P.2d at 1222; *see also Thompson*, 542 P.3d at 226.

[12]      *C.P. ex rel. M.L.*, 996 P.2d at 1222.

[13]      *Id.* (alteration in original) (quoting *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994)).

[14]      *Whittier Props., Inc. v. Alaska Nat'l Ins. Co.*, 185 P.3d 84, 87, 90-91 (Alaska 2008).

Garrison argues that this holding compels a similar conclusion for carbon monoxide. Garrison's argument echoes the district court's reasoning in this case. The district court concluded that in *Whittier Properties* we adopted a literal interpretation of the pollution exclusion. Reading the exclusion and definition of pollutants literally, the district court concluded carbon monoxide was a "pollutant" and that Wheeler's death by carbon monoxide exposure was excluded.

The *Whittier Properties* decision does not compel a particular conclusion in this case. That case involved a different substance, a different factual context, and a different insurance policy. Although it provides some guidance here, it does not relieve us of the duty to examine the policy at issue in this case in light of the insured's reasonable expectations.

In *Whittier Properties* we considered whether an absolute pollution exclusion in a commercial general liability policy excluded losses arising from gasoline that leaked from pipes underneath a gas station into the surrounding groundwater and soil.[15] The insured (the gas station) faced lawsuits from its neighbors and the State, but the insurer refused to defend.[16] The insured argued that the pollution exclusion was ambiguous because it did not include the term "gasoline" in the definition of "pollutant" and because gasoline was considered a "product" in other provisions of the policy.[17] We disagreed.[18] We held there was no ambiguity whether "gasoline is a pollutant within the meaning of the policy exclusion" when it "escapes or reaches a location where it is no longer a useful product."[19] In reaching this conclusion, we quoted in a footnote an amicus brief stating that "[o]ver 100 appellate court cases and 36

---

[15]    *Id.* at 87.

[16]    *Id.* at 87-88.

[17]    *Id.* at 89-91.

[18]    *Id.* at 90-91.

[19]    *Id.*

jurisdictions have ruled that pollution exclusions like the one at issue here unambiguously bar coverage for harms caused by exposure to many different types of pollutants."[20]  This footnote cited a pair of cases showing the weight of authority supporting our conclusion.[21]  Garrison argues that our analysis endorsed a "literal, plain meaning interpretation" of the pollution exclusion.  Garrison also suggests that in citing those cases, we implicitly rejected a more limited reading of the pollution exclusion as applying only to traditional industrial or environmental pollution.

The *Whittier Properties* decision did not go quite that far.  In particular, we are not persuaded by Garrison's suggestion that after *Whittier Properties*, the only relevant question is whether a literal reading of the pollution exclusion and accompanying definition includes carbon monoxide exposure.  We did reject the argument that the lack of express mention of gasoline in the definition of pollutants created ambiguity.[22]  But we did not rule that a literal reading of the pollution exclusion is definitive in all cases, even when other provisions create uncertainty.

As for the two cases cited in the footnote, they were cited only for the proposition that many courts had "ruled that pollution exclusions like the one at issue here unambiguously bar coverage for harms caused by exposure to many different types of pollutants."[23]  We did not go beyond the facts at issue in *Whittier Properties* to decide that any exposure to any substance falling within the literal meaning of the term

---

[20]    *Id.* at 90 n.29 (alteration in original).

[21]    *Id.* (first citing *Deni Assocs. of Fla. Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138-40 (Fla. 1998) (concluding pollution exclusion was unambiguous as applied to ammonia fumes and chemical insecticide but declining to adopt doctrine of reasonable expectations); and then citing *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 735, 743 (Wash. 2005) (en banc) (holding pollution exclusion barred tenant's recovery for injury arising out of exposure to fumes from sealant applied to neighboring deck)).

[22]    *Id.* at 90-91.

[23]    *See id.* at 90 n.29.

"pollutants" is excluded, in all factual contexts and regardless of other policy language. Nor did we reject the argument that the pollution exclusion "applies only to traditional industrial or outdoor environmental harms." Indeed, *Whittier Properties* involved outdoor environmental pollution of the "traditional" sort: gasoline leakage from a gas station into the soil and groundwater.[24] Therefore, the decision does not directly answer the question posed by this case.

Finally, *Whittier Properties* is distinguishable in another important respect. One reason we rejected the insured's argument that its reasonable expectations supported coverage was evidence that it *knew* its policy did not cover damages from leaking gas tanks.[25] There is no such evidence in this case.

## C. An Insured Could Reasonably Expect Coverage For Injury Resulting From Carbon Monoxide Exposure Due To An Improperly Installed Water Heater.

When interpreting insurance contracts, we construe policy language in accordance with "ordinary and customary usage."[26] Coverage is construed "broadly and exclusions narrowly, in favor of insureds."[27] "Any ambiguous terms are to be construed in favor of the insured."[28] "[A]mbiguities only exist when there are two or more reasonable interpretations of particular policy language."[29]

But "[c]onstruction of an insurance policy under the principle of reasonable expectations does not depend on a prior determination of policy

---

[24]    *Id.* at 87.

[25]    *Id.* at 92.

[26]    *Thompson v. United Servs. Auto. Ass'n*, 542 P.3d 222, 226 (Alaska 2024) (quoting *State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008)).

[27]    *Whittier Props., Inc.*, 185 P.3d at 88; *see also Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004).

[28]    *Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1160, 1171 (Alaska 2018).

[29]    *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Houle*, 269 P.3d 654, 658 (Alaska 2011)).

ambiguity."[30]  We honor "[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts . . . even though painstaking study of the policy provisions would have negated those expectations."[31]  "However, since most insureds develop an expectation that every loss will be covered, the reasonable expectation doctrine 'must be limited by something more than the fervent hope usually engendered by loss.' "[32]  Therefore, to determine the reasonable expectations of the parties, "we look to the language of the disputed policy provisions, the language of other provisions of the insurance policy, relevant extrinsic evidence, and case law interpreting similar provisions."[33]

### 1.     Terms of the pollution exclusion

The Estate highlights several aspects of the exclusion's language that, in its view, support a reasonable interpretation that carbon monoxide poisoning from a water heater does not fall within the exclusion.  First, it argues that the six operative terms in the exclusion — discharge, dispersal, release, escape, seepage, and migration — are "environmental terms of art" that "describe the passage of a pollutant from a container to the environment."  It reasons that the plain language of the exclusion does not bar coverage for injury when the water heater's "products of combustion," i.e., carbon monoxide, did *not* disperse.  Second, focusing on the exclusion's subsections related to testing, clean up, and detoxification, the Estate maintains that "[a] reasonable layperson could read the exclusion and conclude that it only applied if the instance of

---

[30]     *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1222 (Alaska 2000).

[31]     *Id.* (alteration omitted) (quoting *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994)).

[32]     *State Farm Fire & Cas. Co. v. Bongen*, 925 P.2d 1042, 1047 (Alaska 1996) (quoting *Millar v. State Farm Fire & Cas. Co.*, 804 P.2d 822, 826 (Ariz. App. 1990)).

[33]     *C.P. ex rel. M.L.*, 996 P.2d at 1223.

pollution involved government ordered cleanup."[34]  Third, the Estate argues that "[a] reasonable layperson could also conclude that 'pollution' in 'pollution exclusion' refers to instances of what a reasonable layperson understands by the term pollution, i.e., traditional outdoor industrial pollution, not improperly vented indoor carbon monoxide."

Garrison disputes the Estate's "container" interpretation, arguing that the policy "simply does not say" that the exclusion applies only to pollutants that escape from containers.  Instead, Garrison argues, the six words of the exclusion connote pollution by any "movement."  Garrison also points out that "pollutants" is a defined term meaning "any solid, liquid, gaseous or thermal irritant or contaminant, including . . . fumes."  It asserts that carbon monoxide is a gas, and that "given its toxic effect upon inhalation, it reasonably falls within the 'fume' category of the 'gaseous . . . contaminant' definition of this policy."  Accordingly, Garrison argues, poisoning from carbon monoxide emitted by an improperly installed water heater falls within the broad, plain language of the pollution exclusion.

Garrison's interpretation is a reasonable reading of the ordinary and customary usage of the words in the policy.  Webster's Dictionary defines carbon

---

[34]  The Estate references this passage at the end of the policy's exclusion:

This includes any loss, cost or expense arising out of any:

(1) Request, demand or order that any **"insured"** or others test for, monitor, clean up, remove, contain, treat, detoxify, or assess the effects of **"pollutants"**; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **"pollutants"**.

monoxide as "a colorless, odorless, highly poisonous gas."[35] "Contaminant" is defined as "a substance that contaminates,"[36] and "contaminate" is defined as "to make impure, infected, corrupt . . . by contact" and to "pollute."[37] "Irritant" is defined as "something that causes irritation."[38] One definition of "irritation" is "a condition of soreness or inflammation in some organ or [bodily] part."[39] It is reasonable to say that carbon monoxide contaminates the air in residences and irritates those who inhale it.

The key question, then, is whether the Estate's narrower reading of the exclusion is also reasonable. There is some logic to its point that the exclusion's use of the general term "pollutants" has a particular connotation, notwithstanding the broad way in which the term is defined. In *Hahn v. GEICO Choice Insurance Company*, we reasoned that a defined term in an insurance policy "must have some bearing on the meaning of the word that partially defines it."[40] The dispute centered upon whether the injured person — a motorcyclist who was hit by the driver and bounced off the car's hood — was "occupying" the car.[41] The policy defined "occupying" to mean "in, upon, getting into or getting out of."[42] Although the motorcyclist was temporarily "upon" the hood of the car, we rejected the argument that he was "occupying" it.[43] We reasoned that while a specific definition can broaden the meaning of a defined term, the

---

[35]     *Carbon monoxide*, WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE (2d ed. 1980).

[36]     *Contaminant, id.*

[37]     *Contaminate, id.*

[38]     *Irritant, id.*

[39]     *Irritation, id.*

[40]     420 P.3d 1160, 1171 (Alaska 2018).

[41]     *Id.* at 1163.

[42]     *Id.*

[43]     *Id.* at 1171.

relationship between terms goes both ways: the defined term shapes the meaning of the words used to define it.[44]

So it is with "pollutants" and the words used to define that term. "Pollutants" and "pollute" have a commonly understood connotation. "Pollutant" is defined as "something that pollutes," especially "a harmful chemical or waste material discharged into the water or atmosphere."[45] That meaning lends support to an interpretation of the exclusion that is somewhat narrower than any substance that contaminates or irritates, such as an accidental discharge of bear repellant or scalding water from a shower head — both of which fall under the literal definition of pollutants. In addition, the terms used to describe the method by which "pollutants" cause harm, such as "discharge" and "dispersal," are "terms commonly associated with environmental law" that suggest a narrower interpretation, excluding coverage for the kind of pollution that harms the environment.[46]

This interpretation is reinforced, as the Estate points out, by the subsections that follow. These subsections target liability for demands or damages related to "testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of 'pollutants.' "[47]

---

[44]     *Id.*

[45]     *Pollutant*, WEBSTER'S NEW WORLD DICTIONARY OF THE AMERICAN LANGUAGE (2d ed. 1980).

[46]     *Essex Ins. Co. v. Avondale Mills, Inc.*, 639 So. 2d 1339, 1341-42 (Ala. 1994); *see also Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 20-21 (N.Y. 2003) (holding that pollution exclusion was ambiguous as applied to "ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander").

[47]     *See Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (noting development of pollution exclusion to exclude coverage for government cleanup).

The question is whether that connotation can reasonably be read to exclude coverage for carbon monoxide poisoning. Not only is the definition of "pollutants" broad, but the exclusion applies to loss arising from discharge of pollutants "however caused and whenever occurring." When the pollution exclusion is considered in isolation, the Estate's arguments struggle to gain traction against the breadth of the exclusion's terms.

### 2. The language of other provisions of the policy

But we do not consider policy provisions in isolation. We consider them in light of "the language of other provisions of the insurance policy."[48] An insured may reasonably draw inferences from the way clauses are grouped together.[49]

The two exclusions that follow the pollution exclusion have a significant effect on how a reasonable insured would interpret the pollution exclusion. Immediately following the pollution exclusion are exclusions for liability "[a]rising out of exposure to lead paint or other lead-based products" and "[a]rising out of exposure to asbestos." Lead paint, lead-based products, and asbestos all fall within the policy's literal definition of "pollutants." They are solid or liquid "contaminant[s]." And the typical ways in which people are poisoned by these substances involves the kind of "movement" described in the pollution exclusion: When lead paint chips come off the windowsill, they are "release[d]," "escape," or "migrat[e]" from their original location. When plumbing materials containing lead corrode, the lead is "discharge[d]" or "release[d]" into the drinking water. Asbestos fibers, if not properly contained, "dispers[e]" through the air, where they can be inhaled.

The express exclusions for exposure to these common household "pollutants" lend support to a narrower interpretation of the pollution exclusion. A reasonable insured could infer from these specific exclusions that exposure to toxic

---

[48]     *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1223 (Alaska 2000).

[49]     *West v. Umialik Ins. Co.*, 8 P.3d 1135, 1138-39 (Alaska 2000).

substances commonly found within the home does not fall within the pollution exclusion. In the same vein, the asbestos and lead exclusions' use of the broad term "exposure" contrasts with the six "movement" words in the pollution exclusion — "discharge, dispersal, release, escape, seepage or migration." "Exposure" means any contact with the substance in question.[50] This lends support to the Estate's argument that the six "movement" words in the pollution exclusion refer to the kinds of movement of toxic substances associated with environmental pollution, rather than inhalation or ingestion of toxic substances in the home. Indeed, it is telling that Garrison argues the movement words are exceedingly broad — covering "all such types and degrees of movement"[51] — while also suggesting that they might be narrow enough to allow coverage for smoke inhalation from a fire inside the house. Garrison's attempt to have it both ways underscores how a reasonable insured might view the pollution exclusion more narrowly than its literal meaning, considered in isolation.

### 3. Relevant extrinsic evidence

The parties have not identified any relevant extrinsic evidence, so this factor is not applicable.

### 4. Case law interpreting similar provisions

As noted above, courts around the country have interpreted similarly or identically worded pollution exclusions in cases with facts similar to this one. To summarize broadly, there are two camps. The first camp includes decisions concluding that carbon monoxide poisoning falls within the plain meaning of the words in the pollution exclusion. The second camp comprises cases rejecting this approach based on a mix of rationales.

---

[50]     *See Exposure*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999) (defining "exposure" as "the fact or condition of being exposed").

[51]     For this proposition, Garrison quotes *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999).

Cases in the first camp generally observe that carbon monoxide is a gas that can poison people who inhale it, and then conclude that these facts are encompassed by the plain terms of the pollution exclusion.[52] These courts sometimes support this conclusion by pointing out that many state and federal regulatory authorities refer to carbon monoxide as a form of pollution.[53] Some courts acknowledge the history of the clause but maintain that it does not warrant reading limitations into the policy that are not otherwise reflected in the plain language.[54] These courts generally apply a literal interpretation to the operative terms of the policy (discharge, escape, release, disperse, etc.).[55] For example, one court concluded that confinement of carbon monoxide in an apartment due to a blocked vent fell within the language of the policy — "discharge, dispersal, seepage, migration, release, or escape"[56] — because the "normal emission of carbon monoxide from an apartment furnace falls within the plain meaning of the terms."[57]

Cases in the second camp, holding that the pollution exclusion does not bar coverage for carbon monoxide exposure in the home, rely on a broader set of

---

[52] *See, e.g.*, *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008); *Nautilus Ins. Co. v. Country Oaks Apartments, Ltd.*, 566 F.3d 452, 455-58 (5th Cir. 2009) (applying Texas law); *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 637-38 (Minn. 2013).

[53] *See, e.g.*, *Midwest Fam. Mut. Ins. Co.*, 831 N.W.2d at 637.

[54] *See, e.g.*, *Reed*, 667 S.E.2d at 92 (concluding "[n]othing in the text of the pollution exclusion clause supports" reading clause in light of its historical purpose); *Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.*, 728 N.W.2d 216, 222 (Iowa 2007) ("Although the court in *Koloms* looked beyond the bare language of the exclusion to find ambiguity, we find it inappropriate and unwise to do so. An ambiguity exists only if the language of the exclusion is susceptible to two interpretations." (internal quotation marks omitted)).

[55] *See, e.g.*, *Nautilus Ins. Co.*, 566 F.3d at 456-58.

[56] *Id.* at 453-54.

[57] *Id.* at 453, 457.

rationales. Some cases find the plain language of the exclusion to be overbroad and narrowly construe it according to its historical application in traditional environmental litigation.[58] Most conclude that the pollution exclusion is ambiguous as to carbon monoxide toxicity in a residential setting.[59] Unlike cases in the first camp, these cases acknowledge that facially unambiguous provisions may be contextually ambiguous — that an ambiguity appears "when a provision is applied to a particular claim."[60]

To resolve the ambiguity, some cases rely heavily on the history of the clause to conclude that the term "pollutants" is limited to forms of "traditional environmental pollution,"[61] or that this is a reasonable interpretation from the insured's perspective.[62] But in our view, the history of the pollution exclusion is not relevant to how a reasonable insured would interpret the policy. Most reasonable people are not aware of the drafting history of clauses in insurance policies.

---

[58] *See, e.g.*, *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 79-82 (Ill. 1997).

[59] *See, e.g.*, *Am. Nat'l Prop. & Cas. Co. v. Wyatt*, 400 S.W.3d 417, 426 (Mo. App. 2013); *Stoney Run Co. v. Prudential-LMI Com. Ins. Co.*, 47 F.3d 34, 38-39 (2d Cir. 1995); *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 617-18 (Nev. 2014); *Thompson v. Temple*, 580 So. 2d 1133, 1135 (La. App. 1991).

[60] *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680 (Ky. App. 1996) (alteration omitted) (quoting *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994)); *see Thompson*, 580 So. 2d at 1135 ("[W]hen there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms."); *see also Stoney Run Co.*, 47 F.3d at 37 (explaining that "[a]n exclusionary clause . . . can be ambiguous in one context and not in another").

[61] *See, e.g.*, *Koloms*, 687 N.E.2d at 80-82.

[62] *See, e.g.*, *Century Sur. Co.*, 329 P.3d at 617-18; *see also Stoney Run Co.*, 47 F.3d at 39.

Other courts in the second camp resolve the contextual ambiguity by focusing on the pollution exclusion's terms. For example, some courts have concluded that the operative terms (discharge, escape, etc.) are terms of art in environmental law.[63]

These courts also connect the broad terms "contaminant" and "irritant" to the term they define — "pollutants."[64] Under this approach, the key question is whether a reasonable policyholder would characterize the particular irritant or contaminant at issue as a "pollutant" under the particular facts of the case.[65] For example, in *Langone v. American Family Mutual Insurance Co.* the Wisconsin Court of Appeals reasoned that because carbon monoxide is frequently present in the home and only becomes dangerous due to ventilation defects causing high concentrations, a reasonable insured may not view carbon monoxide as a "pollutant."[66] An insured "could reasonably expect coverage for damages caused by an accumulation of a substance that is routinely present."[67] The Missouri Court of Appeals used similar reasoning in *American National Property & Casualty Co. v. Wyatt*, describing carbon monoxide as

---

[63] *See e.g.*, *Koloms*, 687 N.E.2d at 81-82; *Wyatt*, 400 S.W.3d at 426; *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 409 S.E.2d 692, 699-700 (N.C. App. 1991); *W. All. Ins. Co. v. Gill*, 686 N.E.2d 997, 999 (Mass. 1997) ("[T]he terms in the pollution exclusion, such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.").

[64] *See Reg'l Bank of Colo., N.A. v. St. Paul Fire & Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994); *Wyatt*, 400 S.W.3d at 424-25; *Langone v. Am. Fam. Mut. Ins. Co.*, 731 N.W.2d 334, 339-340 (Wis. App. 2007).

[65] *See Wyatt*, 400 S.W.3d at 425 ("It seems far more reasonable that a policyholder would understand the exclusion as being limited to irritants and contaminants commonly thought of as pollution and not as applying to every possible irritant or contaminant imaginable." (quoting *Reg'l Bank of Colo., N.A.*, 35 F.3d at 498)); *see also MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1216 (Cal. 2003) (quoting *Reg'l Bank of Colo., N.A.*, 35 F.3d at 498) (same).

[66] 731 N.W.2d at 340.

[67] *Id.*

"contextually ambiguous" because it "does not have the harmful effect of an irritant or contaminant unless or until it accumulates to certain levels."[68]  The court also observed that "carbon monoxide poisoning is one of the more significant and well-known risks of injury related to homeownership."[69]  The court concluded that "[a]bsent clear and unambiguous exclusion of liability for such injuries, a reasonable person purchasing a homeowners or tenants insurance policy would certainly expect coverage for this risk to be included."[70]

A key distinction between the camps is that courts in the first camp generally apply a plain meaning approach to insurance contracts.  By contrast, most courts in the second camp apply a doctrine of the insured's reasonable expectations that is similar to our own.  For that reason, we find the analyses in those cases viewing the specific terms of the exclusion through the lens of the insured's reasonable expectations, like *Wyatt* and *Langone*, most persuasive.

### 5.    Application

In light of the preceding discussion, we conclude that an insured would reasonably expect coverage for liability for poisoning by carbon monoxide from a defectively installed water heater.  The literal terms of the pollution exclusion are broad, but the term "pollutants" has a narrower connotation that is reinforced by the clauses addressing liability for monitoring and detoxification.  The specific exclusions for exposure to lead and asbestos, "pollutants" that are commonly found within the home, supports an insured's reasonable expectation that harm from exposure to carbon monoxide, which is also often found within the home and causes no harm absent a defect or failure, is not an excluded harm.

---

[68]    400 S.W.3d at 425 (quoting *Langone*, 731 N.W.2d at 337).

[69]    *Id.* at 426-27.

[70]    *Id.* at 427.

**D. We Decline To Address Other Arguments By The Estate.**

In its briefing to us, the Estate raises two arguments that go beyond the scope of the certified question. First, it asks us to rule that Garrison breached its duty to defend the insureds from the Estate's claims, and therefore that the insurance company is now precluded from litigating the extent or existence of liability. Second, it asks us to hold that the "dominant proximate cause doctrine" mandates coverage in this case. Generally speaking, this doctrine provides that when the dominant cause of a loss is insured, the insurer may not deny coverage based on an uncovered, secondary risk.[71] The doctrine was relied on to uphold coverage in a recent Washington Supreme Court case with facts similar to this one.[72]

We decline the invitation to go beyond the certified question and express no opinion on those issues.

**V. CONCLUSION**

Our answer to the certified question is that the pollution exclusion in the homeowners insurance policy issued by Garrison does not exclude coverage for injury arising out of exposure to carbon monoxide emitted by an improperly installed home appliance.

---

[71] AS 21.36.096 ("An insurer may not deny a claim if a risk, hazard, or contingency insured against is the dominant cause of a loss and the denial occurs because an excluded risk, hazard, or contingency is also in a chain of causes but operates on a secondary basis.").

[72] *See Xia v. ProBuilders Specialty Ins. Co.*, 400 P.3d 1234, 1240-42 (Wash. 2017) (en banc) (applying "efficient proximate cause rule" under Washington law to conclude policy provided coverage for loss).